444 P.2d 412

STATE of Idaho ex rel. Carl E. TAPPAN, State Reclamation Engineer, Plaintiff-Respondent,

v.

Clyde E. SMITH and Bonnie Smith, husband and wife, Defendants-Appellants.

No. 10006.

Supreme Court of Idaho.

July 23, 1968.

Rehearing Denied Sept. 10, 1968

452

Anderson, Kaufman, Anderson & Ringert, Boise, for appellants.

Allan G. Shepard, Atty. Gen., and William D. Collins, Asst. Atty. Gen., Boise, and Stephen W. Boller, Sp. Asst. Atty. Gen., Shoshone, Herman E. Bedke, Pros. Atty. of Cassia County Burley, for appellee.

SMITH, Chief Justice.

Respondent, the state reclamation engineer, seeks to enjoin appellants, Clyde E. Smith and wife, from withdrawing underground water from a well on their farm, and from changing the point of diversion and place of use of water from two other wells. Respondent prays for an injunction restraining appellants from doing any act violative of respondent's orders of July 3, 1964, and August 25, 1964, and any act violative of the provisions of I.C. § 42-222, relating to change of place of use of water.

Appellants own at least three irrigation wells at the north end of Raft River Valley in Cassia County, Idaho, and they own and farm the lands irrigated by water from the wells. The three wells involved in this action are referred to hereinafter as Section 11 well, Section 12 well, and Section 28 well, describing the geographic location of each well in appellants' farming area.

July 23, 1963, Carl E. Tappan, the then state reclamation engineer issued the "Raft River Critical Ground Water Area Order," declaring a large portion of the Raft River drainage basin to be a critical ground water area. The order stated that it was issued in compliance with I.C. § 42-226 to § 42-239, inclusive.

In the summer of 1964, appellants drilled the Section 11 well on their land. Prior to drilling the well, appellants attempted to follow the statutory appropriation procedure of filing application for and obtaining permit from respondent for appropriation of the ground water to be obtained from the well, but respondent would not entertain the proceeding because of the Critical Ground Water Order. The Section 12 and Section 28 wells were drilled prior to the Critical Ground Water Order, and the statutory application and permit procedure was followed in both instances, a water license having been issued for the Section 28 well. Also, in 1964, appellants filed with the state reclamation engineer an application to change the point of diversion and place

of use of the waters of the Section 28 well, to appellants' lands in Section 11. Respondent declined to hear or process the application.

July 3, 1964, respondent issued a written order that "no water be withdrawn from said well at the center of Section Eleven (11), Township Eleven (11) South, Range Twenty-six (26) East, Boise Meridian, at any time until further notice by this office." Respondent issued a similar order on August 25, 1964. Respondent's complaint· alleges that appellants withdrew ground water from the Section 11 well on August 19, 1964, and on September 6, 1964, contrary to respondent's orders. The present injunction action resulted from appellants' repeated failures to comply with respondent's orders.

Most of the evidence pertains to the geography and water capacity of the Raft River Valley, and to the accuracy of the 1963 Critical Ground Water Area Order. The evidence shows that the Raft River Valley, which lies in northern Utah and southern Idaho, includes approximately a million acres situate in Idaho. Raft River flows in a northerly direction, and empties eventually into Snake River; at its northern extremity, Raft River has been dry during certain portions of many years.

The water supply of the Raft River Basin is derived from precipitation in the basin. The water is consumed by the combination of evaporation and plant transpiration, by crops, and by irrigation. All water, both surface water and underground, not consumed by evapo-transpiration and irrigation, flows into the Snake River Basin, and is lost to irrigation in the Raft River Valley. The evidence demonstrates that there is ground water flowing from the Raft River Basin and being lost to the basin, which water could be diverted and appropriated by wells and used for irrigation.

Respondent testified that he based his Critical Ground Water Order, and subsequent orders to appellants, on a survey of the total water yield of the basin conducted by the U.S. Geological Survey in 1954–1955, and published in 1961. (Nace Report—Geological Survey Water-Supply Paper 1587) The Nace Report summarizes its conclusions by stating, in pertinent part, as follows:

"The preliminary general conclusion is reached that sufficient uncommitted water is available and recoverable in the Raft River Basin to irrigate about 25,-000 to 30,000 additional acres of properly situated land.

"Estimates in this report indicate that a moderate increase in irrigation would further deplete the water supply only moderately. However, this indication is the result of a series of estimates and extrapolations made on the basis of scanty data. The analysis of hydrologic factors and the estimates of water yield were made carefully, but the result is still only an estimate which probably will be revised in time.

"Conservatism is advisable in further development in the Raft River basin. If the water yield estimated in this report is much higher than the actual yield, the consequence of rapid exploitation might be unfortunate. Overdevelopment might occur before positive symptoms of it were detected by hydrologic means, but the authors believe that development on the scale suggested above would be conservative. If increased draft on the water supply were made in increments of a few thousand acre-feet per year, it would be feasible by hydrologic means to detect symptoms of over-development before it became excessive. Two factors will potentially limit the development: the amount of water available, and the amount of the available supply that can be recovered economically from wells." P. 106.

A subsequent U.S. Geological Survey report (Mundorff report—Geological Survey Water-Supply Paper 1619-CC) was prepared on the Raft River Basin, which report was published in 1963 and based on studies made in 1960. The Mundorff re-

port estimated [1] that the average quantity of ground water occurring each year and leaving the basin was about 200,000 acre feet, as compared with the Nace report's estimate of 140,000 acre feet. The Mundorff report thus determined that there was substantially more ground water susceptible to diversion for irrigation than was determined by the Nace report.

Respondent testified that he relied on the conclusions in the Nace report, as opposed to the more recent Mundorff report, in issuing the Raft River Critical Ground Water Area Order, because "they seemed to be on the conservative side; seemed to be more reasonable and more easily understood; more easily defined." He further testified, in response to questions concerning his choice of survey:

"I did look at Mr. Mundorff's report, but my conclusion was Mr. Nace had better information and a better treatise on the conditions in the valley. * * * After some perusal of literature and my knowledge of the methods, it occurred to me that the Nace report would perhaps be more reasonable in view of the lack of information that all those reports needed, or were short of."

Respondent then stated that he rejected the conclusions of the Mundorff report as to the amount of water in the basin because, "it seemed to me he lacked the same information that Nace did, * * * as far as precipitation and stream flows and underground water return."

In addition to the estimates contained in the Nace and Mundorff reports, two other estimates of the water yield of the Raft River Basin were introduced in evidence. Horton G. Haight, a civil engineer and former employee of the State Department of Reclamation, prepared studies on ground water conditions in the Raft River Basin, in 1964 and 1965, and estimated that there was about 75,500 acre feet of annual uncommitted ground water as of 1965. Keith Anderson, a consulting engineer and geologist and expert witness for appellants testified that he estimated that there was, after the existing commitments of available water in the basin, about 180,000 acre feet of annual uncommitted ground water. Anderson estimated that two-thirds of such uncommitted ground water would be recoverable, and that 80,000 acre feet per year would be available for further irrigation.

Respondent stated that the amount of water in the valley already appropriated for irrigation, together with the amount of water for which permits to appropriate had been issued prior to the Critical Ground Water Order, constituted a serious drain in the water supply of the valley, and that the withdrawal of underground water was approaching the estimated amount of water available. His Critical Ground Water Order, and the specific orders to appellants, are based upon such conclusions.

The trial court ruled that the evidence demonstrated a lowering of the water table in the area of the wells in question, and dangerous depletion of the underground water supply in the particular area of the wells. The court then held the critical

---

1. "The water table has declined generally throughout the Raft River basin during the past decade. Declines of 10 to 20 feet are general in the areas of heaviest pumpage. A 3-to-5 foot decline has generally occurred in much of the basin away from centers of pumping, and at least part of this decline is related to below-normal precipitation in the basin and consequent reduced recharge during two periods, 1954–55 and 1959–60.
\* \* \*
"A conservative estimate by Nace and others (1961) of unused and uncommitted underflow from the basin in 1955 was 140,000 acre-feet. Ground-water pumpage doubled between 1955 and 1960, so that unused and uncommitted underflow has been greatly reduced. Use of the precipitation-water yield relation developed in the report by Mundorff and others (1960) gives a water yield for the Raft River basin of about 320,000 acre-feet before irrigation development. Deducting irrigation use leaves perhaps 200,000 acre-feet of unused and uncommitted underflow annually from the basin as of 1955, a considerably larger amount than that estimated by Nace and others (1961, p. 80). \* \* \* \*"

ground water declaration to be valid and enforceable.

The trial court concluded that appellants should be enjoined from pumping water from their Section 11 well. The court, by its judgment, ordered appellants to cap that well, and to remove therefrom the motor and turbine pump, and affirmatively required appellants to comply with the orders of the state reclamation engineer of July 3, 1964, and August 25, 1964, and with all provisions of Idaho Code, Title 42, Chapter 2, as amended. Finally, the court, by such judgment, denied appellants' application to change the place of use of the water from the Section 28 well to the area of the Section 11 well. Appellants have appealed from the judgment.

Appellants contend that the trial court erred initially "in holding that the laws of Idaho require an appropriator of ground water to follow the application, permit and license procedure in the Department of Reclamation."

Article 15, Section 3,[2] of Idaho's Constitution is the constitutional basis for our statutes regulating appropriation of waters of the state. Under our constitutional sanction, I.C. § 42–103 states that "The right to the use of the waters of rivers, streams, lakes, springs, and of subterranean waters, may be acquired by appropriation."

I.C. § 42–230 [3] and I.C. § 42–226 [4] define ground water and the traditional policies of the State of Idaho with respect to supervision and control of the appropriation, and allotment and use of ground water.

Historically, we have recognized two methods of appropriation of the waters of this state, and have held that either of the methods may be followed at the option of the appropriator. See Pioneer Irr. Dist. v. American Ditch Assn., 50 Idaho 732, 1 P.2d 196 (1931); Reno v. Richards, 32 Idaho 1, 178 P. 81 (1918); Nielson v. Parker, 19 Idaho 727, 115 P. 488 (1911). We specifically extended and applied this principle to ground water in Silkey v.

2. "Water of natural stream—Right to appropriate—State's regulatory power—Priorities.—The right to divert and appropriate the unappropriated waters of any natural stream to beneficial uses, shall never be denied, except that the state may regulate and limit the use thereof for power purposes. Priority of appropriation shall give the better right as between those using the water; but when the waters of any natural stream are not sufficient for the service of all those desiring the use of the same, those using the water for domestic purposes shall (subject to such limitations as may be prescribed by law) have the preference over those claiming for any other purpose; and those using the water for agricultural purposes shall have preference over those using the same for manufacturing purposes. And in any organized mining district those using the water for mining purposes or milling purposes connected with mining, shall have preference over those using the same for manufacturing or agricultural purposes. But the usage by such subsequent appropriators shall be subject to such provisions of law regulating the taking of private property for public and private use, as referred to in section 14 of article I of this Constitution."

3. "42–230. Definitions.—(a) 'Ground water' is all water under the surface of the ground whatever may be the geological structure in which it is standing or moving."

4. "42–226. Ground waters are public waters.—It is hereby declared that the traditional policy of the state of Idaho, requiring the water resources of this state to be devoted to beneficial use in reasonable amounts through appropriation, is affirmed with respect to the ground water resources of this state as said term is hereinafter defined *: and, while the doctrine of 'first in time is first in right' is recognized, a reasonable exercise of this right shall not block full economic development of underground water resources, but early appropriators of underground water shall be protected in the maintenance of reasonable ground water pumping levels as may be established by the state reclamation engineer as herein provided. All ground waters in this state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same for beneficial use. All rights to the use of ground water in this state however acquired before the effective date of this act are hereby in all respects validated and confirmed."

Tiegs, 51 Idaho 344, 351–353, 5 P.2d 1049 (1931).

■ In 1963, by amendment, the legislature enacted the present version of I.C. § 42–229, reading as follows:

"42–229. Methods of appropriation.— The right to the use of ground water of this state may be acquired only by appropriation. Such appropriation may be perfected by means of the application permit and license procedure as provided in this act; provided, however, that in the event an appropriation has been commenced by diversion and application to beneficial use prior to the effective date of this act it may be perfected under such method of appropriation. All proceedings commenced prior to the effective date of this act for the acquisition of rights to the use of ground water under the provisions of sections 42–201—42–225, Idaho Code, may be completed under the provisions of said sections and rights to the use of ground water may be thereby acquired. But the administration of all rights to the use of ground water, whenever or however acquired or to be acquired, shall, unless specifically excepted herefrom, be governed by the provisions of this act."

This section of the statute does not deny the right to appropriate ground water, but regulates the method and means by which one may perfect a right to the use of such water. The regulation is in accord with Article 15, Sections 1 and 3, of Idaho's Constitution, and with I.C. §§ 42–103 and 42–226. Thereby the legislature prescribed that from the effective date of the act which precedes the present action, the statutory method of appropriation would be the sole method of appropriating ground water. The trial court did not err in finding that our laws require an appropriator of ground water to follow the application, permit and license procedure of the Department of Reclamation.

Respondent's 1963 Critical Ground Water Area Order, and his subsequent specific orders directed to appellants to cease withdrawing water from their Section 11 well, were authorized by the statute.

I.C. § 42–231 prescibes the duties of the state reclamation engineer; in pertinent part it reads:

"* * * It shall likewise be the duty of the state reclamation engineer to control the appropriation and use of the ground water of this state as in this act provided and to do all things reasonably necessary or appropriate to protect the people of the state from depletion of ground water resources contrary to the public policy expressed in this act."

I.C. § 42–237a defines the powers of the state reclamation engineer in the effectuation of his duties. I.C. § 42–237a states, again in pertinent part:

"In the administration and enforcement of this act and in the effectuation of the policy of this state to conserve its ground water resources, the state reclamation engineer is empowered:

"a. To require all flowing wells to be so capped or equipped with valves that the flow of water can be completely stopped when the wells are not in use.

* * * * * *

"f. To commence actions to enjoin the illegal opening or excavation of wells or withdrawal or use of water therefrom and to appear and become a party to any action or proceeding pending in any court or administrative agency when it appears to the state reclamation engineer that the determination of such action or proceeding might result in depletion of the ground water resources of the state contrary to the public policy expressed in this act.

"g. To supervise and control the exercise and administration of all rights hereafter acquired to the use of ground waters and in the exercise of this power he may by summary order, prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available. To assist the state reclamation engineer in the administra-

tion and enforcement of this act, and in making determinations upon which said orders shall be based, he may establish a ground water pumping level or levels in an area or areas having a common ground water supply as determined by him as hereinafter provided. Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or result in the withdrawing the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge. * * *"

■ The findings and actions of the state reclamation engineer do not take from the court the power to grant relief to a party whose rights have been infringed. Keller v. Magic Water Company, 92 Idaho 276, 441 P.2d 725 (1968); Broughton's Estate v. Central Oregon Irr. Dist., 165 Or. 435, 101 P.2d 425, aff'd on rehearing 108 P.2d 276 (1940).

In the case at bar, respondent's orders to appellants of July 3, 1964, and August 25, 1964, to the effect that they must cease pumping water from their Section 11 well, were based on his findings in issuing the 1963 Raft River Valley Critical Ground Water Area Order. Such Critical Ground Water Area Order is authorized by I.C. §§ 42–226 and 42–231 and defined by I.C. § 42–233a.[5]

■ The record provides evidence of the findings or estimates of several experts, or groups of experts, concerning the water yield of the Raft River Basin. The evidence conflicts materially in demonstrating the uncommitted ground water of the basin available for further irrigation, and it is clear that the figures provided are merely estimates, based on differing methods of computing the annual precipitation, evapotranspiration, surface runoff, and other pertinent factors. Respondent testified that he based his 1963 Critical Ground Water Order primarily upon the results of a survey, conducted by R. L. Nace and others and published in 1961 as an official report of the U.S. Geological Survey, and upon the number of outstanding permits to appropriate water in the basin. We have carefully examined the evidence and conclusions of the Nace report, as well as the evidence contained in the estimates of the

5. "42–233a. 'Critical ground water area' defined—Public hearings—Publication of notice—Granting or denial of application —Appeal.—'Critical ground water area' is defined as any ground water basin, or designated part thereof, not having sufficient ground water to provide a reasonably safe supply for irrigation of cultivated lands, or other uses in the basin at the then current rates of withdrawal, or rates of withdrawal projected by consideration of valid and outstanding applications and permits, as may be determined and designated, from time to time, by the state reclamation engineer.

"Upon the designation of a 'critical ground water area' it shall be the duty of the state reclamation engineer to conduct a public hearing in the area concerned to apprise the public of such designation and the reasons therefor. Notice of the hearing shall be published in two (2) consecutive weekly issues of a newspaper of general circulation in the area immediately prior to the date set for hearing.

* * * * *

"In the event the application for permit is made in an area which has been designated as a critical ground water area, if the state reclamation engineer from the investigation made by him on said application as herein provided, or from the investigation made by him in determining the area to be critical, or from other information that has come officially to his attention, has reason to believe that there is insufficient water available subject to appropriation at the location of the proposed well described in the application, the state reclamation engineer may forthwith deny said application; provided, however, that if ground water at such location is available in a lesser amount than that applied for the state reclamation engineer may issue a permit for the use of such water to the extent that such water is available for such appropriation. * * *"

other experts herein, and we cannot say that the methods employed by Nace in making his estimates are either inferior to the methods employed elsewhere, or incorrect.[6] Recognizing the authority of the state reclamation engineer to rule upon such matters, Broughton's Estate v. Central Oregon Irr. Dist., supra; Keller v. Magic Water Company, supra, we hold that the 1963 Critical Ground Water Area Order was validly issued.

The trial court stated, in the findings of fact and conclusions of law, that:

"* * * The sole question is whether it [the critical ground water area declaration] is valid as to the well in question. Mr. Anderson's testimony seemed to indicate that the basin itself is not in danger of immediate depletion of water resources. But a careful examination of his testimony would not support a conclusion that in the particular area of the wells there is not a dangerous depletion. In fact, the evidence presented by the plaintiff seems rather graphically to illustrate that in the area of the wells there is being a rather remarkable lowering of the water table.

"While Mr. Anderson testified that such lowering is not of itself significant, the weighing of the evidence convinces me that in the area of these particular wells there is a dangerous depletion of the underground water supply, and it is my conclusion that as concerns the wells in question the critical ground water declaration is valid and enforceable. * * *"

Respondent's witnesses all testified that in their judgment the expanding ground water development in the Raft River Basin was seriously depleting the available resources. Exhibits prepared and presented by respondent indicate a large decline in the water table of the basin, both in terms of total decline and also of the rate at which the decline has progressed. The Mundorff survey supports the theory of general water decline. Appellant's witness, Keith Anderson, testified that his conclusions as to water depletion were to the contrary, although he did state that in his opinion continued pumping would necessarily lower the water levels of the applicable aquifers. Anderson estimated that a lowering of the water levels in an aquifer would not necessarily affect the water supply, however, because of the recharge to the aquifers from irrigation.

It is evident that the testimony of the various expert witnesses constituted merely estimates or conclusions based on facts and methods of computation available to them. As such, the testimony is advisory only, and served to assist the trier of the facts to understand and apply other evidence. See Anderson v. Lloyd, 64 Idaho 768, 139 P.2d 244 (1943); Nisted v. Winton Lumber Co., 61 Idaho 1, 99 P.2d 52 (1939); Evans v. Cavanagh, 58 Idaho 324, 73 P.2d 83 (1937). Considering the various surveys and exhibits presented, there is sufficient evidence in the record to support the trial court's finding that there is a dangerous depletion of the underground water supply in the area of the wells in question. Accordingly, we hold that on the basis of I.C. §§ 42–231, 42–237a(f), 42–237a(g) and 42–233a, the trial court properly enjoined appellants from pumping water from their Section 11 well.

The injunction constitutes an affirmance of respondent's orders to appellants of July 3, 1964, and August 25, 1964. The injunction having been properly ordered, it was not error for the trial court affirmatively to require appellants to comply with such orders.

The trial court further ruled:

"That the defendant, their agents, servants and employees, are hereby perpetual-

.6. We note that the Nace report, based on laborious findings and computations, provides neither the most conservative nor the most liberal estimate of the annual uncommitted ground water available for further irrigation, and constitutes at least as comprehensive a survey of the water capacity of the basin as any of the other reports.

ly enjoined from doing any act or acts which constitute a violation of Title 42, Chapter 2, Idaho Code, as amended."

There is nothing specified in such portion of the trial court's order to indicate illegal acts by appellants; hence such portion of the injunctive order is meaningless and superfluous, although not reversible error.

Appellants contend that the court erred in entering judgment denying appellants' application to change the point of diversion and place of use from their Section 28 well to land situate in the locality of their Section 11 well.

The trial court recited, in its conclusions of law, that "the plaintiffs' refusal to allow what the defendant calls a change of diversion is a proper exercise of his administrative duties under the conclusions I have reached * * *." Appellants allege that they made application to change the point of diversion and place of use of water on their lands, but that respondent declined to entertain the application because of the

outstanding critical ground water area order.

Applications of change of point of diversion and place of use of water are sanctioned by I.C. § 42–211,[7] by I.C. § 42–222,[8] and by I.C. § 42–237.[9]

Both of the parties to this cause in presenting this appeal in effect state that a "collateral issue" is involved, i. e., whether appellants should be allowed to change the point of diversion of the waters from their licensed well in Section 28 to their land situate in Section 11.

The record in the case at bar does not contain any application by appellants for an amendment of the point of diversion of the waters from the Section 28 well. The record indicates, however, that such an application was made. Appellant Clyde E. Smith testified that he made such application and filed it with the state reclamation engineer, and that he paid the statutory fee, but that the state reclamation engineer did not act upon the application. Appellant Clyde E. Smith testified that he made such

7. "42–211. Amended application and permit. Whenever a permit has been issued pursuant to the provisions of this act, and the permit holder desires to change the place, period, or nature of the intended use, or make other substantial changes in the method of diversion or proposed use or uses of the water, he shall file an application for amendment upon forms to be furnished by the department of reclamation. * * * and * * * it shall be the duty of the department of reclamation to examine same and if approval thereof would not result in the diversion and use of more water than originally permitted and if the rights of others will not be adversely affected thereby, the state reclamation engineer shall approve said application. * * * The priority of the right established pursuant to a permit which has been amended under these provisions shall date from the date of the original application for permit, * * *."

8. "42–222. Abandonment—Change of point of diversion and place of use. * * * Any person desiring to change the point of diversion or the place of use of such water shall first make application to the department of reclamation, stating fully in such application the reason for making such transfer. Such application shall

describe the land, the use of water on which it is to be abandoned and shall describe the land to which it is desired to have such right transferred, and if such water is to be conducted to such land through another canal or lateral or from a different point of diversion than the one described in the license or decree of the court confirming such right, such facts shall be fully set out in such application, and, if the department shall require it, a plat showing the location of such land and ditches, or canals or points of diversion shall be furnished by such applicant; * * *."

9. "42–237. Abondonment of water right —Change of point of diversion and place of use.—The provisions relating to loss of water rights by nonuse and abandonment, as set forth in section 42–222, shall apply to ground water rights. The provisions of section 42–222, relating to change of point of diversion and change of place of use of water, shall be applicable to waters accruing from water rights, provided, that the withdrawal of waters from the same ground water supply at another location in lieu of withdrawal at the original location shall be considered a change of point of diversion."

application and filed it with the state reclamation engineer, and that he paid the statutory fee, but that the state reclamation engineer did not act upon the application. Appellant Smith's testimony in that regard, adduced on both direct and cross examination, was not contraverted.

Such testimony is supportive of appellants' sixth affirmative defense to the effect that they have used and desire to use all of the water on the whole of their lands in the cultivation and irrigation thereof; specifically, they allege, "More beneficial use can be made of all such waters in such manner than by confining the water from individual wells to individual tracts of defendants [appellants]. No one is injured by such use of waters from the wells of defendants. The state reclamation engineer has no proprietary interest in any waters or water rights which may in any manner be affected by such use." Appellants then allege in such affirmative defense that they made applications to the state reclamation engineer to establish such use but that the engineer did not act thereon.

The record, however, shows little, if any, evidence in the proceedings at bar to indicate why appellants should not have been allowed to change the point of diversion and place of use of the water on their lands in any proceeding based upon appellants' application to change the point of diversion and place of use of the water; similarly, there is not direct evidence to indicate that the rights of others would be adversely affected by such changes. The trial court nevertheless adjudged that appellants' application to transfer waters from his licensed well in Section 28 to his lands situate in Section 11 be denied.

It is thus clear that there has been no determination of the application for change of point of diversion and place of use of the waters of the Section 28 well, which application appellants assert they made and filed with the state reclamation engineer. The trial court erred in attempting to adjudicate such application in this proceeding. Particularly is this true inasmuch as the proceeding at bar is one wherein respondent sought to enjoin appellants from continuing the use of waters from the Section 11 well.

The judgment of the trial court is affirmed insofar as it enjoins the appellants from using the waters of Section 11 well and requiring them to cap the same and to remove the motor and turbine pump therefrom.

The judgment is reversed insofar as it denies appellants the right to transfer waters from their licensed Section 28 well and the cause is remanded to the district court with instructions to refer this issue back to the state reclamation engineer for appropriate proceedings in conformity with the views expressed herein.

TAYLOR, McQUADE, McFADDEN and SPEAR, JJ., concur.