513 P.2d 627

Simon L. BAKER et al., Plaintiffs
and Respondents,

v.

ORE–IDA FOODS, INC., a Delaware
corporation, et al., Defendants,

Ore-Ida Foods, Inc., a Delaware corpora-
tion, HOI Corporation, (formerly Ore-Ida
Foods, Inc.), an Oregon corporation, De-
fendants and Appellants,

Golden Valley Land & Cattle Company,
a corporation, et al., Defendants and
Respondents.

No. 11039.

Supreme Court of Idaho.

July 26, 1973.

Adonis H. Nielson of Nielson, Nielson & Nielson, Burley, R. Allen Wight of Miller, Anderson, Nash, Yerke & Wiener, Portland, Or., for defendants and appellants.

Thomas G. Nelson of Parry, Robertson, Daly & Larson, Twin Falls, for plaintiffs and respondents.

Lloyd J. Walker of Walker, Depew & Kennedy, Twin Falls, for defendants and respondents Golden Valley.

Herman E. Bedke, Burley, for defendants and respondents Glenn Briggs and Hazel Briggs, Bill Brockman and Jane Doe Brockman.

SHEPARD, Justice.

This is an appeal from a judgment for plaintiffs enjoining defendants from operating their irrigation wells. Defendants' wells pumped from a ground water aquifer underlying both plaintiffs' and defendants' land. This Court must for the first time, interpret our Ground Water Act (I.C. § 42–226 et seq.) as it relates to withdrawals of water from an underground aquifer in excess of the annual recharge rate. We are also called upon to construe our Ground Water Act's policies of promoting "full economic development" of ground water resources and maintaining "reasonable pumping levels."

This case focuses on approximately 20 irrigation wells developed during the late 1950's and early 1960's in the Cottonwood Creek-Buckhorn Creek area of Cassia County in southern Idaho. The parties to this suit were engaged in farming operations in that area. Underlying this area is a limestone aquifer of unknown depth.

This aquifer is recharged primarily by means of precipitation. There is not enough annual recharge water to satisfy the needs of all the well owners during the summer irrigation season.

Plaintiffs-respondents Baker, et al., originally brought this action in July 1965 seeking to enjoin defendants-appellants Ore-Ida Foods, et al. from pumping irrigation water from their wells until such time as plaintiffs' wells resumed normal production. In February, 1969 the case was tried to the district court sitting without a jury. The trial was essentially a battle between three hydrology experts presented respectively by the plaintiffs-respondents, defendants-respondents and defendants-appellants. The record in the case is voluminous including prolix water records extending back more than 20 years. The district court entered its amended decree October 5, 1971.

The district court found that the parties and their predecessors in interest had developed irrigation wells having a certain order of priority.[1] The district court also found that all of the wells drew water from a common aquifer underlying the area. The aquifer was of unknown depth but was capable of a metes and bounds description. The court further found that the aquifer is recharged primarily by precipitation, at an average rate of 5,500 acre ft. per year. The court concluded that during the period 1961 through 1968 the parties had withdrawn water from the aquifer far in excess of the annual recharge rate causing a 20 ft. per year drop in the aquifer's water level. In other words the parties were apparently "mining" the aquifer, i. e., perennially withdrawing ground water at rates beyond the recharge rate. Bagley, E. S., Water Rights Law and Public Policies Relating to Ground Water "Mining" in the Southwest-

1.

| Owner | Pole No. | Permit No. | Licensed amounts in c.f.s. | Priority (permit) Date | Date water first applied to a beneficial use |
|-------|----------|------------|----------------------------|------------------------|----------------------------------------------|
| Briggs-Brockman | 205 | G–20805 | 1.64 | Dec. 13; 1948 | (All 3 permits transferred to well at pole 205 by 6/10/64 order of State Engineer) June 10, 1964 |
|  |  | G–21359 | 3.30 | Jan. 16, 1950 |  |
|  |  | G–27866 | .55 | Apr. 3, 1959 |  |
| Golden Valley | 208 | G–27908 | 3.56 | Apr. 29, 1959 | June 6, 1960 |
| Baker-Poulton | 339 | G–27987 | 4.00 | June 16, 1959 | July 2, 1962 |
| Baker-Poulton | 214 | G–28052 | 6.31 | Jul. 20, 1959 | June 6, 1960 |
| Golden Valley | 348 211 | G–28374 | 13.50 | Jan. 13, 1960 | Sept. 13, 1962 |
| Golden Valley | 386 | G–28539 | 4.90 | Mar. 7, 1960 | June 28, 1964 |
| Golden Valley | 215 216 217 | G–28540 | 16.52 | Mar. 7, 1960 | June 8, 1961 |
| Golden Valley | 209 | G–28543 | 3.16 | Mar. 11, 1960 | June 10, 1960 |
| Golden Valley | 207 | G–28544 | 7.10 | Mar. 11, 1960 | May 2, 1960 |
| Ore-Ida | 221 | G–28550 | 4.8 | Mar. 18, 1960 | Oct. 4, 1960 |
| Ore-Ida | 220 | G–28551 | 5.24 | Mar. 18, 1960 | Oct. 4, 1960 |
| Ore-Ida | 219 | G–28552 | 4.32 | Mar. 18, 1960 | May 8, 1961 |
| Ore-Ida | 224 | G–28553 | 5.39 | Mar. 18, 1960 | July 10, 1961 |
| Ore-Ida | 225 | G–28553 | 5.39 | Mar. 18, 1960 | July 10, 1961 |
| Briggs-Brockman |  | G–28632 | 1.14 | Apr. 16, 1960 | June 6, 1960 |
| Briggs-Brockman |  | G–28649 | 2.03 | Apr. 22, 1960 | June 16, 1962 |
| Ore-Ida | 218 | G–28741 | 3.45 | May 25, 1960 | June 28, 1961 |
| Ore-Ida | 222 | G–29078 | 3.40 | Oct. 10, 1960 | June 2, 1961 |
| Ore-Ida | 223 | G–29536 | 3.64 | Mar. 3, 1961 | May 1, 1961 |

ern States, 4 J. Law & Econ. 144, 145 (1961).

The court calculated that one cubic foot per second of water flowing for 24 hours would produce 1.983 acre ft. and held that the average annual natural recharge could be pumped entirely by the four senior wells.[2] The court enjoined *pumping from all other wells* and assigned further administration of its decree to the Idaho Department of Water Administration (IDWA), [formerly the Department of Reclamation, *see* I.C. § 42–1801a]. The decree granted the IDWA full power to expand or limit the amounts of available water for pumping so long as the pumping never exceeded the annual rate of recharge. The amended decree also granted the IDWA the authority to modify its determination of the annual recharge rate.

Defendants-appellants have assigned as error the following factual findings of the trial court:

That there is a single aquifer capable of metes and bounds description; that the aquifer is primarily recharged by precipitation; that the average annual recharge rate was 5,500 acre ft. per year; that all the wells involved in the case were on the same aquifer; that the water levels in these wells had declined in a similar manner from year to year.

■■■■ We have examined the record at length and note that there is conflicting testimony as among the experts on all of these points. We conclude that the trial court's findings are supported by substantial, competent, although conflicting evidence and they will not be altered. Factual findings will not be disturbed on appeal when they are supported by substantial though conflicting evidence and they will not be set aside unless clearly erroneous. Ivie v. Peck, 94 Idaho 625, 495 P. 2d 1110 (1972); Reardon v. Union Pacific Railroad, 93 Idaho 833, 475 P.2d 370 (1970); I.R.C.P. 52(a).

Appellants assert that Idaho's Ground Water Act, I.C. § 42–226 et seq., has superseded Idaho's common law rules relating to ground water. Appellants argue that, although they are junior, they are nevertheless entitled, under the doctrine of correlative rights, to a mutual pro rata share of the water in the aquifer. Appellants further assert that pursuant to the Ground Water Act senior appropriators may only enjoin junior appropriators from pumping by showing that the juniors' pumping has exceeded reasonable pumping levels.

We must examine the evolution and development of water law to place these important ground water issues in their proper perspective. While the earliest origins of water law are obscure, the Code of Hammurabi and the Roman law contained provisions concerning irrigation and water rights. In U. S. v. Gerlach Live Stock Co., 339 U.S. 725, 744–745, 70 S.Ct. 955, 94 L.Ed. 1231 (1950) Mr. Justice Jackson summarized the development of water law as follows:

"In the middle of the Eighteenth Century, English common law included a body of water doctrine known as riparian rights. That also was the general Mexican law, if it had any lingering authority

**2.**

| Pole No. | Owner | Permit No. | Licensed Amounts (cfs) | Acre Ft. per 180 day irrigation Season |
|---|---|---|---|---|
| 205 | Briggs-Brockman | G–20805 | 1.64 | |
| | | G–21359 | 3.30 | |
| | | G–27866 | .55 | 1982 (total) |
| 208 | Golden Valley Mutual Water Co. | G–27905 | 3.56 | 1271 |
| 339 | Baker-Poulton | G–27987 | 4.00 | 1428 |
| 214 | Baker-Poulton | G–28052 | 6.31 | 819 |
| | | | | 5500 AF |

there \* \* \* except for a peculiar concession to 'pueblos.' Indeed, riparian-rights doctrines prevailed through western civilization.

"As long ago as the Institutes of Justinian, running waters, like the air and the sea, were *res communes*—things common to all and property of none. Such was the doctrine spread by civil-law commentators and embodied in the Napoleonic Code and in Spanish law. From these sources, but largely from civil-law sources, the inquisitive and powerful minds of Chancellor Kent and Mr. Justice Story drew in generating the basic doctrines of American water law."

The law of surface water has evolved along two divergent paths of riparianism and prior appropriation. The origins of the riparian doctrine are disputed and obscure. The riparianism theory came into prominence in both England and the eastern United States during the early 19th Century. Its fundamental precept is that usufructuary rights in a stream's water are created as an incident of ownership of riparian land. Each riparian owner had a co-equal right to the stream's natural flow without any significant alterations of either its quality or its quantity and, therefore, the riparian user must return the water to the stream channel. 1 Clark, Water and Water Rights, § 16 (1967); 1 Hutchins, W. A., Water Rights Laws in the Nineteen Western States, 154–156 (1971).

Riparianism has two distinct allocation theories: natural flow and reasonable use. Under the natural flow theory each riparian owner has an absolute right to the undiminished flow of the stream as it flowed in its natural state. The natural flow theory was harsh and unworkable and the courts evolved the reasonable use theory, i. e., under all the circumstances involved, a determination is made of the reasonability of the use considering the needs of all other riparians. Sax, J. L., Water Law, Planning & Policy, 1–3 (1968); Restatement (Second) of Torts, § 850A (Tent.Draft No. 17, 1971).

Nine western states, plus Alaska and Hawaii have accepted limited forms of riparianism. 1 Clark, Water and Water Rights, §§ 4.3, 15.2 (1967). Eight of the more arid western states (Colorado, Nevada, Arizona, Idaho, Utah, New Mexico, Wyoming and Montana) rejected riparianism and adopted the prior appropriation system. 1 Hutchins, W. A., Water Rights in the Nineteen Western States, 154–156 (1971).

The prior appropriation system was used in both 19th Century Mexico and in the early Mormon settlements in Utah, but it is generally agreed that prior appropriation stems primarily from the customs of the pioneer western miners. 1 Weil, E. C., Water Rights in the Western States, §§ 71 through 81 (3d ed. 1911). Under the prior appropriation doctrine, water rights are created by beneficial use rather than land ownership. The right may be lost by abandonment or nonuse. The water may be beneficially used on nonriparian lands. Disputes between competing appropriators are largely resolved on a seniority basis so that the appropriator with the earliest date of application to a beneficial use will prevail over junior appropriators. 1 Clark, *supra; see also* I.C. §§ 42–101 to 42–112. In Drake v. Earhart, 2 Idaho 750, 23 P. 541 (1890) Idaho emphasized its allegiance to prior appropriation.

We have heretofore discussed only surface water. The early ground water decisions mirror the riparian doctrine by holding that ground water rights depend on land ownership. The oldest and most rigid theory of ground water allocation is the common law rule of absolute ownership under which a landowner has an unqualified right to remove unlimited amounts of the water underlying his land. Greenleaf v. Francis, 35 Mass. 117 (1836). American courts followed the absolute ownership doctrine until 1862 when the Supreme Court of New Hampshire modified the doctrine by adopting the rule of reasonable use as to percolating ground waters. Bassett v. Salisbury Mfg. Co., 43 N.H. 569, 577–579 (1862). Under reasonable use a

landowner could withdraw percolating waters under his land to the extent that such withdrawals were reasonably consistent with the similar rights of other neighboring landowners. However, the reasonable use doctrine prohibited the transportation of ground water for use in areas other than the overlying land. Bassett v. Salisbury Mfg. Co., *supra*. *Note,* State Management of Ground Water Mining, 6 Land & Water L.Rev. 569 (1971).

California altered the reasonable use theory by creating its unique doctrine of correlative rights which requires that a common but insufficient water supply be divided among competing overlying landowners so that each receives an amount of the available water proportionate to his ownership of the overlying land. When there is more than enough water to meet the needs of the overlying owners surplus water may be used on non-overlying lands. However, such transportation is forbidden when there is not enough water to fill the pro rata shares of overlying owners. Katz v. Walkinshaw, 141 Cal. 116, 70 P. 663 (1902); Pasadena v. Alhambra, 33 Cal.2d 908, 207 P.2d 17 (1949); Hutchins, W. A., the California Law of Water Rights, 431–454 (1956); 1 Clark, Water and Water Rights, § 52.2(B)(1967).

In summary, American courts apply one of the following doctrines to ground water:

1. Absolute ownership;

2. Absolute ownership as modified by reasonable use;

3. Correlative rights;

4. Prior appropriation.

The courts and legislatures have drawn further distinctions in applying these doctrines depending on whether the ground water lies in a rechargeable or a non-rechargeable aquifer. In a non-rechargeable aquifer the water is simply a stock resource and it can reasonably be determined when it will be totally exhausted. Decisions must be made as to whether to use it, when to use it and how to use it. New Mexico pioneered this area by imposing strict controls on withdrawals from its numerous non-rechargeable aquifers. Bagley, E. S., Water Rights Law and Public Policies Relating to Ground Water "Mining" in the Southwestern States, 4 J.Law & Econ. 144 (1961); Mathers v. Texaco, Inc., 77 N.M. 239, 421 P.2d 771 (1966).

A *rechargeable* aquifer, however, is a flow resource and the real problem is how best to utilize the annual supply without overdrafting the stock which maintains the aquifer's water level. In the years since World War II, most western states have enacted legislation establishing administrative controls over ground water withdrawals. Clark, R. E., Ground Water Legislation in the Light of Experience in the Western States, 22 Mont.L.Rev. 42 (1960). Idaho was in the vanguard of this movement when we enacted our Ground Water Act in 1951; I.C. § 42–226 et seq.

The instant case requires construction of the Ground Water Act against the backdrop of the uneven development of our common law concerning ground water. Idaho has vascillated on the question of the appropriability of ground water. As early as 1899 our statutes listed "subterranean waters" as among those subject to appropriation. S.L.1899, p. 380 § 2. In Bower v. Moorman, 27 Idaho 162, 147 P. 496 (1915) the Court repudiated the absolute ownership doctrine and held that percolating waters may be appropriated. Seven years later the court apparently reversed itself in Public Utilities Commission v. Natatorium Co., 36 Idaho 287, 211 P. 533 (1922), and held that percolating waters underlying private land were not subject to appropriation. That case, however, suggested that waters in an underground stream might be appropriated.

In Hinton v. Little, 50 Idaho 371, 296 P. 582 (1931) the court eradicated the questionable historical distinction between underground streams and percolating waters and stated that *all* underground waters are percolating waters. *Hinton* again rejected the absolute ownership doctrine and held that the litigants could appropriate a common body of artesian water under their

land. *See also* I.L.J. 190 (1931); Union Central Life Ins. Co. v. Albrethsen, 50 Idaho 196, 294 P. 842 (1930).

Silkey v. Tiegs, 51 Idaho 344, 5 P.2d 1049 (1931) further expanded *Hinton* and ruled that percolating waters may be appropriated by diversion and application to a beneficial use. *Silkey* suggested that percolating waters may be appropriated by either the constitutional method or the statutory permit method.

In 1963 amendments to the Ground Water Act, I.C. § 42–229 (S.L.1963, ch. 216, § 1, p. 624), altered the traditional assumption that ground water in Idaho could be appropriated by either the constitutional method or the permit method. We construed that amendment in State ex rel. Tappan v. Smith, 92 Idaho 451, 456, 444 P.2d 412, 417 (1968) and held:

"This section of the statute does not deny the right to appropriate ground water, but regulates the method and means by which one may perfect a right to the use of such water. The regulation is in accord with Article 15, Sections 1 and 3, of Idaho's Constitution, and with I.C. §§ 42–103 and 42–226. Thereby the legislature prescribed that from the effective date of the act which precedes the present action, the statutory method of appropriation would be the sole method of appropriating ground water. The trial court did not err in finding that our laws require an appropriator of ground water to follow the application, permit and license procedure of the Department of Reclamation."

*Smith* says the state may regulate appropriations of ground water without violating our constitutionally mandated prior appropriation system. *See* Harvey, L.K., Mandatory Permit System for the Acquisition of Water Rights in Idaho, 2 Idaho L.Rev. 42 (1965); Paine, The Effect of Bonnie and Clyde Upon the Acquisition of Water Rights in Idaho, 6 Idaho L.Rev. 105 (1969).

We turn now to problems concerning the maintenance of water table levels. An early Idaho case dealing with assessments by an irrigation district set forth the following remarks concerning ground water:

"We conclude, however, that he had no right to insist the water table be kept at the existing level in order to permit him to use the underground waters. There is no proof that he secured water from a natural subterranean stream. The evidence tends to show that he secured it from water collected beneath the surface of the ground due to seepage and percolation. To hold that any land owner has a legal right to have such a water table remain at a given height would absolutely defeat drainage in any case, and is not required by either the letter or spirit of our constitutional and statutory provisions in regard to water rights." Nampa & Meridian Irr. Dist. v. Petrie, 37 Idaho 45, 51, 223 P. 531, 532 (1923).

In a subsequent water table case, Noh v. Stoner, 53 Idaho 651, 657, 26 P.2d 1112, 1114 (1933) the Court upheld an injunction forbidding a junior well owner from interfering with a senior's appropriation of ground water. The Court stated:

"If subsequent appropriators desire to engage in such a contest [a race for the bottom of the aquifer] the financial burden must rest on them and with no injury to the prior appropriators or loss of their water. Otherwise, if the users [seniors] go below the appellants [juniors] and respondents were to go below them appellants would in turn, according to their theory, be deprived of their water with no redress."

*Noh* suggests that a senior appropriator of ground water is forever protected from any interference with his *method* of diversion. Under *Noh* the only way that a junior can draw on the same aquifer is to hold the senior harmless for any loss incurred as a result of the junior's pumping. If the costs of reimbursing the senior became excessive, junior appropriators could not afford to pump from the aquifer. *See* Colorado Springs v. Bender, 148 Colo. 458, 366 P.2d 552 (1961). *Noh* was inconsistent

with the full economic development of our ground water resources. *See* Hutchins, W.A., Selected Problems in the Law of Water Rights in the West, at 179 (U.S. Dept.Agric.Misc.Pub. 418, 1942) ; Comment, Who Pays When the Well Runs Dry?, 37 U.Colo.L.Rev. 402 (1965) ; Sax, J. L., Water Law Planning and Policy, 469 (1968), Note, Rights to Underground Water in Oregon : Past, Present and Future, 3 Willamette L.J. 317, (1965) ; Hutchins, W. A., The Idaho Law of Water Rights, 5 Idaho L.Rev. 1, (1968).

Apparently our Ground Water Act was intended to eliminate the harsh doctrine of *Noh*:

"It is hereby declared that the traditional policy of the state of Idaho, requiring the water resources of this state to be devoted to beneficial use in reasonable amounts through appropriation, is affirmed with respect to the ground water resources of this state as said term is hereinafter defined * : *and, while the doctrine of 'first in time is first in right' is recognized, a reasonable exercise of this right shall not block full economic development of underground water resources, but early appropriators of underground water shall be protected in the maintenance of reasonable ground water pumping levels as may be established by the state reclamation engineer* [director of the department of water administration] *as herein provided.* All ground waters in this state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same for beneficial use. All rights to the use of ground water in this state however acquired before the effective date of this act are hereby in all respects validated and confirmed." (Emphasis in original) I.C. 42–226.

\*　\*　\*　\*　\*　\*

"*In the administration and enforcement of this act and in the effectuation of the policy of this state to conserve its ground water resources, the state recla-*mation [director of the department of water administration] *is empowered*: (Emphasis in original) I.C. 42–237a.

"g. To supervise and control the exercise and administration of all rights hereafter acquired to the use of ground waters and in the exercise of this power he may by summary order, prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available. To assist the state reclamation engineer [director of the department of water administration] in the administration and enforcement of this act, and in making determinations upon which said orders shall be based, he may establish a ground water pumping level or levels in an area or areas having a common ground water supply as determined by him as hereinafter provided. *Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or result in the withdrawing the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge.*" (Emphasis supplied) I.C. 42–237a, subd. g.

This portion of our Ground Water Act has been analyzed as follows :

."Ten of the thirteen states that have passed remedial ground water legislation have evidenced dissatisfaction with the law of appropriation as developed by the courts. *By far the majority of these legislatures intended that full development should be the goal of subsurface water development.* Yet, with the exception of Oklahoma's statute, none of the statutes unequivocally implements that intention. The Idaho statute, for example, recognizes the doctrine of priority but states that this doctrine 'shall not block full economic development of underground water resources. . . .'

The same sentence goes on to guarantee that 'early appropriators . . . shall be protected in the maintenance of reasonable . . . pumping levels. . . . .' It is evident that the goal of full development has been compromised by a recognition of some right in the appropriator to his means of diversion. *If 'reasonable pumping levels' were interpreted by the court as requiring each appropriator to alter his means of diversion a little each year, or a little with each subsequent appropriator until full development was achieved, the statute would accomplish its purpose.*" (Emphasis supplied) Comment, Who Pays When the Well Runs Dry? 37 U.Colo.L.Rev. 402, 413 (1965).

Where the clear implication of a legislative act is to change the common law rule we recognize the modification because the legislature has the power to abrogate the common law. Meade v. Freeman, 93 Idaho 389, 462 P.2d 54 (1969); Swayne v. Dept. of Employment, 93 Idaho 101, 456 P.2d 268 (1969). We hold *Noh* to be inconsistent with the constitutionally enunciated policy of optimum development of water resources in the public interest. *Noh* is further inconsistent with the Ground Water Act.

Although the trial court in the instant case said the Ground Water Act did not mitigate the common law ruling of *Noh* this statement is merely dicta because the trial court did in fact apply the fundamental principles of the Ground Water Act.

■ Appellant argues in essence that mutual pro rata rights in the aquifer should be established. This argument is based upon the doctrine of correlative rights. The correlative rights doctrine is based upon the riparian principle of land ownership. *See* Pasadena v. Alhambra, 33 Cal.2d 908, 207 P.2d 17 (1949), cert. den. sub nom. California-Michigan Land and Water Co. v. Pasadena, 339 U.S. 937, 70 S.Ct. 671, 94 L.Ed. 1354 (1950). The doctrine of correlative rights is repugnant to our constitutionally mandated prior appropriation doctrine. The court in Hinton v. Little, 50 Idaho 371, 296 P. 582 (1931) expressly rejected the theory upon which the doctrine of correlative rights is based.

The Idaho Ground Water Act, I.C. § 42–237a(g) provides in pertinent part:

" * * * *Water in a well shall not be deemed available to fill a water right therein* if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or *result in the withdrawing the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge.*" (Emphasis supplied)

■ We now hold that Idaho's Ground Water Act forbids "mining" of an aquifer. The evidence herein clearly shows that the pumping by all parties was steadily drawing down the water in the aquifer at the rate of 20 ft. per year. Since our statute explicitly forbids such pumping, the district court did not err in enjoining pumping beyond the "reasonably anticipated average rate of future natural recharge."

Perhaps dispositive of this case is the Act's prohibition of ground water "mining." The trial court found that the four senior appropriators would exhaust the aquifer's entire annual recharge. If the junior appropriators were permitted to continue pumping in the amount of their asserted rights they would mine the aquifer. Even so, appellants argue that "under the facts presented, the court of equity should have decreed that each of the parties had a proportional interest in the water resource." Appellants argue that our Act's phrases "reasonable pumping levels" and "full economic development" command a decree granting each of the appropriators, regardless of seniorty, a proportionate amount of the aquifer's water.

We reiterate our holding that Idaho's Ground Water Act clearly prohibits the withdrawal of ground water beyond the average rate of future recharge. I.C. §

42–237a(g). In this regard Idaho differs from those of other less fortunate states because we have not yet had to develop legislation regarding withdrawals from non-rechargeable aquifers.

■ Idaho's Ground Water Act seeks to promote "full economic development" of our ground water resources. I.C. § 42–226. Other western states have enacted analogous ground water legislation enunciating the same policy. Sax, J. L. Water Law, Planning & Policy 469 (1968). We hold that the Ground Water Act is consistent with the constitutionally enunciated policy of promoting optimum development of water resources in the public interest. Idaho Const. art. 15, § 7. Full economic development of Idaho's ground water resources can and will benefit all of our citizens. Trelease, F. J., Policies for Water Law: Property Rights, Economic Forces, and Public Regulations, 5 Nat.Res.J. 1, (1965); Hutchins, W. A., Ground Water Legislation, 30 Rocky Mtn.L.Rev. 416 (1958).

■ Appellants contend that our Act's use of the phrase "reasonable pumping levels" means that senior appropriators are not necessarily entitled to maintenance of historic pumping levels. We agree with appellants in this regard. However, our agreement avails appellants nothing because the trial court found the aquifer's water supply inadequate to meet the needs of all appropriators.

■ A senior appropriator is only entitled to be protected to the extent of the "reasonable ground water pumping levels" as established by the IDWA. I.C. § 42–226. A senior appropriator is not absolutely protected in either his historic water level or his historic means of diversion. Our Ground Water Act contemplates that in some situations senior appropriators may have to accept some modification of their rights in order to achieve the goal of full economic development. See Piper and Thomas, Hydrology and Water Law: What is Their Future Common Ground? Water Resources and the Law 7 (1958); Hutchins, W. A., Ground Water Legisla-

tion, 30 Rocky Mtn.L.Rev. 416 (1958); Note, State Management of Ground Water Mining, 6 Land & Water L.Rev. 569 (1971); Comment, Appropriation and Colorado's Ground Water: A Continuing Dilemma, 40 Colo.L.Rev. 133 (1967); cf., Martz, C.O., The Law of Underground Waters, 11 Okla.L.Rev. 26 (1958).

In the enactment of the Ground Water Act, the Idaho legislature decided, as a matter of public policy, that it may sometimes be necessary to modify private property rights in ground water in order to promote full economic development of the resource. The legislature has said that when private property rights clash with the public interest regarding our limited ground water supplies, in some instances at least, the private interests must recognize that the ultimate goal is the promotion of the welfare of all our citizens. See Clark, 5 Water and Water Rights, § 446 at 474 (1972). We conclude that our legislature attempted to protect historic water rights while at the same time promoting full development of ground water. Priority rights in ground water are and will be protected insofar as they comply with reasonable pumping levels. Put otherwise, although a senior may have a prior right to ground water, if his means of appropriation demands an unreasonable pumping level his historic means of appropriation will not be protected.

■ Because of the need for highly technical expertise to accurately measure complex ground water data the legislature has delegated to the IDWA the function of ascertaining reasonable pumping levels. See Young and Ralston, Reasonable Pumping Lifts for Idaho, Water Information Bulletin No. 21, IDWA, 1971. Implicit in this delegation is the recognition that reasonable pumping levels can be modified to conform to changing circumstances. See, Hutchins, W. A., Ground Water Legislation, 30 Rocky Mtn.L.Rev. 416, 436 (1958). We note that the findings of the IDWA are vested with a presumption of correctness. Keller v. Magic Water Co., 92 Idaho

276, 441 P.2d 725 (1968). Idaho's Administrative Procedure Act, I.C. § 67–5215 sets out standards for judicial review of such agency action.

In the case at bar it is apparent under our Ground Water Act that the senior appropriators may enjoin pumping by the junior appropriators to the extent that the additional pumping of the juniors' wells will exceed the "reasonably anticipated average rate of future recharge." The seniors may also enjoin such pumping to the extent that pumping by the juniors may force seniors to go below the "reasonable pumping levels" set by the IDWA.

A necessary concomitant of this statutory matrix is that the senior appropriators are not entitled to relief if the junior appropriators, by pumping from their wells, force seniors to lower their pumps from historic levels to reasonable pumping levels. It should also be noted that those reasonable pumping levels are subject to later modification by the IDWA.

We turn now to appellants' assertions that:

"The trial court erred in holding that rights to underground water could not be obtained by prescriptive use or adverse possession."

And,

"The trial court erred in holding that changes in point of diversion or place of use did not affect a party's water right priority."

Both these assignments substantially mistake the district court's holding on these points. The trial court ruled that the appellants *failed to establish by a preponderance of the evidence,* the elements of adverse possession or prescriptive right. The district court further found that:

"All parties *failed to prove by a preponderance of the evidence* that any change in place of use or point of diversion of any of the rights enumerated herein injured the rights of any of the parties." (Emphasis supplied)

We find nothing in the record to support the appellants' assertions that the trial court held that water rights could not be acquired by prescriptive use or adverse possession, or that changes in points of diversion or places of use could not affect water right priority. Thus appellants assign as error matters outside the record which will not be considered on appeal. Neer v. Safeway Stores, Inc., 92 Idaho 361, 442 P.2d 771 (1968); Hansen v. Devaney, 82 Idaho 488, 356 P.2d 57 (1960); Lanning v. Sprague, 71 Idaho 138, 227 P.2d 347 (1951).

Appellants next claim that the district court erred in failing to defer primary jurisdiction to the IDWA. We applied the doctrine of primary jurisdiction in Grever v. Idaho Telephone Co., 94 Idaho 900, 499 P.2d 1256 (1972). The doctrine is set forth in 3 Davis, Administrative Law Treatise, § 19.01 at 1.3 (1958) as follows:

"The doctrine of primary jurisdiction or exclusive primary jurisdiction or primary decision or preliminary resort or prior resort is not a doctrine that governs judicial review of administrative action. In this important respect, it is altogether different from the doctrines of exhaustion and of ripeness, which govern the timing of judicial review of administrative action. The doctrine of primary jurisdiction determines whether the court or agency should make the initial decision.

"The precise function of the doctrine of primary jurisdiction is to guide a court in determining whether the court should refrain from exercising its jurisdiction until after an administrative agency has determined some question or some aspect of some question arising in the proceeding before the court."

I.C. § 42–1401 suggests that primary jurisdiction in water disputes may often rest with the IDWA. In the instant case the district court could have found primary jurisdiction in the IDWA because of the

**586**

need to resolve the complex factual issues presented herein. This point need not be considered further because the trial court effectively mooted the primary jurisdiction question by relinquishing the entire matter to the IDWA for administration and possible future modification.

■ Finally appellants contend the trial court erred in holding that the doctrine of waiver did not apply in the instant action. This assignment of error is unsupported by either argument or authority and therefore will not be considered on appeal. Sup.Ct. Rule 41, subd. 2; Haggerty v. Western Barge, Inc., 94 Idaho 509, 492 P. 2d 48 (1971).

The judgment of the district court is affirmed. Costs to Respondents.

DONALDSON, C. J., and McQUADE, McFADDEN, and BAKES, JJ., concur.