## IN THE SUPREME COURT OF THE STATE OF IDAHO
### Docket No. 38403/38421/38422

)
IN THE MATTER OF THE PETITION FOR )
DELIVERY CALL OF A&B IRRIGATION )
DISTRICT FOR THE DELIVERY OF )
GROUND WATER AND FOR THE )
CREATION OF A GROUND WATER )
MANAGEMENT AREA. )
-------------------------------------------------------- )
A & B IRRIGATION DISTRICT, )
)
    Petitioner-Appellant, )
)
v. )
)
IDAHO DEPARTMENT OF WATER )
RESOURCES and GARY SPACKMAN, in )
his official capacity as Interim Director of the )
IDAHO DEPARTMENT OF WATER )
RESOURCES, )
)
    Defendants-Respondents, )
)
and )
)
THE IDAHO GROUND WATER )
APPROPRIATORS, INC.; THE CITY OF )
POCATELLO; FREMONT MADISON )
IRRIGATION DISTRICT; ROBERT & SUE )
HUSKINSON; SUN-GLO INDUSTRIES; )
VAL SCHWENDIMAN FARMS, INC.; )
DAVID SCHWENDIMAN FARMS, INC.; )
DARRELL C. NEVILLE; SCOTT C. )
NEVILLE; STAN D. NEVILLE, )
)
    Cross-Appellants.

Boise, February 2012 Term

2012 Opinion No. 115

Filed: August 2, 2012

Stephen W. Kenyon, Clerk

Appeal from the District Court of the Fifth Judicial District, State of Idaho, Minidoka County.  Hon. Eric J. Wildman, District Judge.

District court decision affirmed.

Barker, Rosholt & Simpson, LLP, Twin Falls, for appellants.  Travis L. Thompson argued.

Hon. Lawrence G. Wasden, Idaho Attorney General, Boise, for respondent Idaho Department of Water Resources. Christopher M. Bromley, Deputy Attorney General argued.

Racine Olson Nye Budge Bailey, Pocatello, for respondent Idaho Ground Water Appropriators, Inc. Candice M. McHugh argued.

White & Jankowski, LLP, Denver, CO, for respondent City of Pocatello. Sarah A. Klahn argued.

---

BURDICK, Chief Justice

This case involves the Director (Director) of the Idaho Department of Water Resources' (IDWR) application of the Rules for Conjunctive Management of Surface and Ground Water Resources (CM Rules), IDAPA 37.03.11, in response to a ground water to ground water delivery call filed by the A&B Irrigation District (A&B). The Director's Final Order found that A&B was not materially injured and was affirmed by the district court on nearly all points. A&B now appeals to this Court, contending that the Director and the district court erred in their analyses. Cross-appeals by the City of Pocatello (Pocatello) and the Idaho Ground Water Appropriators, Inc. (IGWA) allege that the district court erred by requiring that the Director's finding of no material injury must be supported by clear and convincing evidence, rather than a preponderance of the evidence. We affirm the decision of the district court.

## I. FACTUAL AND PROCEDURAL BACKGROUND

1. Introduction and History

The A&B Irrigation District is located in south-central Idaho near the town of Rupert. Underlying the A&B project is the Eastern Snake Plain Aquifer (ESPA), which serves as the project's water source.[1] As described by the district court, the ESPA is predominately composed of fractured quarternary basalt that, at some locations, may have an aggregate thickness that exceeds several thousand feet, decreasing to shallower depths in the Thousand Springs area. The northern two-thirds of the project are dominated by basalt while the southern third is composed of basalt layered with sediment. "Snake River basalt is the principal water-bearing formation,

---

[1] "The ESPA is defined as the aquifer underlying an area of the Eastern Snake River Plain that is about 170 miles long and 60 miles wide as delineated in the report 'Hydrology and Digital Simulation of the Regional Aquifer System, Eastern Snake River Plain, Idaho,' U.S. Geological Survey Professional Paper 1408-F, 1992, excluding areas lying both south of the Snake River and west of the line separating Sections 34 and 35, Township 10 South, Range 20 East, Boise Meridian."

and it yields water copiously to wells." The United States Bureau of Reclamation (USBR) describes the southern third as an area "[w]here the flow sheets are made up of dense, and massive basalt and/or is covered, penetrated, or innerbedded with fine sediment, the water yield is small to moderate. One such area is in the southwest part of Unit B located mostly in T9S/R22E where several low yielding wells are found."

With this understanding of the hydrogeologic environment, the USBR constructed the North Side Pumping Division of the Minidoka Project. The project was begun in the early 1950s with the intention of developing arable land in Jerome and Minidoka Counties. At this time aquifer levels had peaked, and by the time the project was completed in 1963 the levels began to decline. As a result, roughly half of the project's wells had been redrilled by 1965.

Originally, the project had an open discharge design where water was pumped from the ground into surface ponds and delivered through open lateral systems to the user. This system experienced a conveyance loss estimated at eight percent. In the 1980s, A&B began converting its gravity flow system to sprinkler irrigation, which reduced conveyance losses to five percent.

2. A&B's Senior Water Right 36-2080.

A&B's delivery call is based on its senior water right, 36-2080. This water right was licensed by IDWR in 1965 and authorized the diversion of 1,100 cfs from 177 individual points of diversion in order to irrigate 62,604.3 acres. A&B also irrigates roughly 4,000 additional "enlargement acres" under this water right. Water right 36-2080 did not identify a specific place of use with each diversion point.[2]

In 2003, the Snake River Basin Adjudication (SRBA) partially decreed the water right in a decree that is substantially similar to the 1965 license. One difference between the partial decree and the license is that the decree states that A&B, pursuant to transfer, is authorized to divert water from 188 points of diversion. Of those 188 authorized points of diversion, 177 of A&B's wells are currently in active production. These individual wells comprise over 130 separate "well systems."

---

[2] This was intentionally sought by the USBR: "We emphasize that the project is one integrated system, physically, operationally, and financially. . . . Therefore it is impractical and undesirable to designate precise land areas within the project served by each of the specific wells on the list."

### 3. A&B's 1994 Delivery Call and Subsequent Procedure

On July 26, 1994, A&B filed a petition for delivery call, which sought both an administration of junior-priority ground water rights from the ESPA and a designation of the ESPA as a ground water management area (GWMA).[3] Among other things, the petition alleged that junior priority groundwater pumping from the ESPA had, since 1959, lowered the water table an average of twenty feet and up to forty feet in some areas, which resulted in a 126 cfs reduction of A&B's diversion rate. On May 1, 1995, A&B, IDWR, and others entered into an agreement that stayed the petition for delivery call until a Motion to Proceed was filed with the Director. That Motion to Proceed was filed electronically by A&B on March 16, 2007, and sought the same outcome as in the original delivery call. At a September 20, 2007 status conference the Director notified the parties that the stay was lifted from the 1994 delivery call and that retired Chief Justice Gerald Schroeder (Hearing Officer) was appointed to oversee a hearing "and issue a recommendation pursuant to IDAPA Rule 37.01.01.410, .413 . . . ." Those sections of the administrative code are IDWR's Rules for Conjunctive Management of Surface and Ground Water Resources (CM Rules).

Shortly after the stay was lifted, the Director, in accordance with Rule 42, issued an Order Requesting Information that asked A&B to provide IDWR with information that the Director deemed relevant in making a determination of injury. On January 29, 2008, the Director issued a final order (January 2008 Final Order) finding that A&B was not materially injured and denying A&B's request to designate the ESPA as a GWMA. A&B then filed a petition for rehearing.

A&B's petition was granted, and after some preliminary matters a hearing commenced on December 3, 2008. At the hearing, evidence and testimony was presented by IDWR, A&B, IGWA, and Pocatello. On March 27, 2009, the Hearing Officer issued an Opinion Constituting

---

[3] A "'Ground Water Management Area' is defined as any ground water basin or designated part thereof which the director of the department of water resources has determined may be approaching the conditions of a critical ground water area." I. C. § 42-233b.

> 'Critical ground water area' is defined as any ground water basin, or designated part thereof, not having sufficient ground water to provide a reasonably safe supply for irrigation of cultivated lands, or other uses in the basin at the then current rates of withdrawal, or rates of withdrawal projected by consideration of valid and outstanding applications and permits, as may be determined and designated, from time to time, by the director of the department of water resources.

I. C. § 42-233a.

Findings of Fact, Conclusions of Law and Recommendations (Recommendations). Among the Hearing Officer's pertinent findings:

> [T]he Idaho Ground Water Act is applicable to the administration of water rights involved in this case, including those rights that preexisted the adoption of the Ground Water Act in 1951, and are subject to administration consistent with the subsequent amendments to the Act.
>
> . . . .
>
> It is proper to consider the system as a whole.
>
> . . . .
>
> [T]here is an obligation of A&B to take reasonable steps to maximize the use of [interconnection] to move water within the system before it can seek curtailment or compensation from juniors.
>
> . . . .
>
> Crops may be grown to full maturity on less water than demanded by A&B in this delivery call.
>
> . . . .
>
> The conditions in the southwest area that make the recovery of water from the wells difficult do not justify curtailment or other mitigation.
>
> . . . .
>
> That A&B has not been required to exceed reasonable pumping levels.[4]

The recommendations of the Hearing Officer were accepted by the Director in a Final Order Regarding the A&B Irrigation District Delivery Call (Final Order) issued on June 30, 2009. In response, A&B filed a Petition for Review with the district court.

The district court issued an order and accompanying memorandum on May 4, 2010.[5] This order affirmed the Director's Final Order on all pertinent substantive issues, but found that

---

[4] "Reasonable Ground Water Pumping Level" is a term defined by IDAPA 37.03.11.010.18 as:

> A level established by the Director pursuant to Sections 42-226, and 42-237a.g., Idaho Code, either generally for an area or aquifer or for individual water rights on a case-by-case basis, for the purpose of protecting the holders of senior priority ground water rights against unreasonable lowering of ground water levels caused by diversion and use of surface or ground water by the holders of junior-priority surface or ground water rights under Idaho law.

[5] The Memorandum Decision and Order on Petition for Judicial Review had several conclusions that are at issue in this appeal.

1. The decision of the Director that the 1951 GWA applies to the administration of pre-enactment water rights is affirmed.
2. The Director erred by failing to apply the evidentiary standard of clear and convincing evidence in conjunction with the finding that the quantity decreed to A & B's 36-2080 exceeds the quantity being put to beneficial use for purposes of determining material injury. The case is remanded for the limited purpose of the Director to apply the appropriate evidentiary standard to the existing record. No further evidence is required.
3. The decision of the Director that A & B has not been required to exceed reasonable pumping levels is affirmed. This is based on the finding of no material injury at existing pumping

5

the Director erred by applying an improper evidentiary standard when analyzing whether A&B was materially injured. The district court remanded for the purpose of applying the clear and convincing evidence standard. After receipt of petitions for rehearing, the district court issued a memorandum decision and order affirming its prior ruling. On November 23, 2010, the district court filed a judgment pursuant to its May 4, 2010 Memorandum Decision and Order on Petition for Judicial Review. A&B timely filed a Notice of Appeal to this Court on December 29, 2010. Pocatello timely filed a Notice of Appeal to this Court on December 30, 2010, and IGWA timely filed a Notice of Appeal on January 4, 2011.

## II. ISSUES ON APPEAL

1. Whether the Director erred in concluding that A&B's 1948 water right is subject to the provisions of the 1951 Idaho Ground Water Act (I.C. §§ 42-226 to 42-239) and its subsequent amendments.

2. Whether the Director erred in finding that A&B has not been required to pump water beyond a "reasonable ground water pumping level" even though the Director failed to identify a specific pumping level.

3. Whether the Director erred in failing to analyze water availability at the 177 individual wells or points of diversion for purposes of an injury analysis to A&B's senior water right; and whether the Director unconstitutionally applied the CM Rules by finding that A&B must interconnect individual wells or well systems across the project before a delivery call can be filed.

4. Whether the district court erred in imposing the "clear and convincing" evidence standard on the Director's determination of material injury in a delivery call.

## III. STANDARD OF REVIEW

Judicial review of a final decision or order of the Director is governed by the Idaho Administrative Procedure Act (IDAPA), title 67, chapter 52 of the Idaho Code. I.C. § 47-1701A(4).

In an appeal from the decision of a district court acting in its appellate capacity under the IDAPA, this Court reviews the agency record independently of the district court's decision. *Barron v. Idaho Dept. of Water Res.*, 135 Idaho 414, 417, 18 P.3d 219, 222 (2001). This Court

---

levels. On remand, following the application of the appropriate evidentiary standard a finding of material injury may require that the Director reevaluate this determination.

4. The decision of the Director to evaluate material injury to the 36-2080 water right based on depletion to the cumulative quantity as opposed to determining injury based on depletions to individual points of diversion is affirmed. The decision of the Director to require A & B to take reasonable steps to move water from performing to underperforming areas or alternatively demonstrate physical or financial impracticability is affirmed.

"shall not substitute its judgment for that of the agency as to the weight of the evidence on questions of fact." I.C. § 67-5279(1). This Court "instead defers to the agency's findings of fact unless they are clearly erroneous. In other words, the agency's factual determinations are binding on the reviewing court, even where there is conflicting evidence before the agency, so long as the determinations are supported by substantial competent evidence in the record." *Urrutia v. Blaine Cnty.*, 134 Idaho 353, 357, 2 P.3d 738, 742 (2000) (internal citations omitted).

> When the agency was required by the provisions of this chapter or by other provisions of law to issue an order, the court shall affirm the agency action unless the court finds that the agency's findings, inferences, conclusions, or decisions are:
> (a) in violation of constitutional or statutory provisions;
> (b) in excess of the statutory authority of the agency;
> (c) made upon unlawful procedure;
> (d) not supported by substantial evidence on the record as a whole; or
> (e) arbitrary, capricious, or an abuse of discretion.
> If the agency action is not affirmed, it shall be set aside, in whole or in part, and remanded for further proceedings as necessary.

I.C. § 67-5279(3). Even if one of these conditions is met, this Court will still affirm the agency action "unless substantial rights of the appellant have been prejudiced." I.C. § 67–5279(4); *see also Barron*, 135 Idaho at 417, 18 P.3d at 222.

## IV. ANALYSIS

**A. The Director did not err in concluding that A&B's 1948 water right is subject to the provisions of the 1951 Idaho Ground Water Act (I.C. §§ 42-226 to 42-239) and its subsequent amendments**.

A&B argues that the district court erred when it concluded that the Idaho Ground Water Act (GWA), I.C. §§ 42-226 to 42-239, applies to A&B's water right 36-2080. More specifically, that a plain reading of I.C. § 42-226 precludes the Director from applying the 1951 Ground Water Act to A&B's 1948 water right.[6]

1. Standard of Review

"The interpretation of a statute 'must begin with the literal words of the statute; those words must be given their plain, usual, and ordinary meaning; and the statute must be construed as a whole. If the statute is not ambiguous, this Court does not construe it, but simply follows

---

[6] The distinction is important, as the Ground Water Act only protects a senior water right to a "reasonable pumping level," I.C. § 42-226. The now-superseded common law protected senior pumpers to their historic pumping levels. *See Noh v. Stoner*, 53 Idaho 651, 653, 26 P.2d 1112, 1114 (1933) (suggesting that the diversion of a senior right holder is forever protected from interference by junior right holders).

the law as written.'" *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho 889, 893, 265 P.3d 502, 506 (2011) (quoting *State v. Schwartz,* 139 Idaho 360, 362, 79 P.3d 719, 721 (2003)). "We have consistently held that where statutory language is unambiguous, legislative history and other extrinsic evidence should not be consulted for the purpose of altering the clearly expressed intent of the legislature." *Id*. (quoting *City of Sun Valley v. Sun Valley Co.,* 123 Idaho 665, 667, 851 P.2d 961, 963 (1993)).

> [W]e have never revised or voided an unambiguous statute on the ground that it is patently absurd or would produce absurd results when construed as written, and we do not have the authority to do so. 'The public policy of legislative enactments cannot be questioned by the courts and avoided simply because the courts might not agree with the public policy so announced.'

*Id*. at 896, 265 P.3d at 509 (quoting *State v. Village of Garden City,* 74 Idaho 513, 525, 265 P.2d 328, 334 (1953)).

2. Analysis

As currently written, I.C. § 42-226 states, *inter alia*, that "[t]his act shall not affect the rights to the use of ground water in this state acquired before its enactment." A&B argues that the statute unambiguously does not apply to their water right, which has a priority date of 1948. IDWR responds that a lone sentence does not have the ability to exempt water right 36-2080 from the provisions of the GWA.

The district court held that A&B's reasoning would lead to an absurd result and must be rejected. When read in isolation, the above line from I.C. § 42-226 appears to exempt water right 36-2080 from the provisions of the GWA. But as the district court held, "when construing the Act in its entirety, and specifically taking into account the plain language of I.C. § 42-229, it becomes clear that the Legislature intended a distinction between the 'right to the use of ground water' and the 'administration of all rights to the use of ground water.'" To analyze whether the district court erred, the starting point is the original language of the Ground Water Act.

a. 1951 Ground Water Act

As originally written, the Ground Water Act was divided into sections, two of which are pertinent to this issue. Section 1 of the 1951 Ground Water Act states that:

> Ground waters are public waters—It is hereby declared that the traditional policy of the state of Idaho, requiring the water resources of this state to be devoted to beneficial use in reasonable amounts through appropriation, is affirmed with respect to the ground water resources of this state as said term is hereinafter defined. All ground waters in this state are declared to be the property

8

of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same for beneficial use. ***All rights to the use of ground water in this state however acquired before the effective date of this act are hereby in all respects validated and confirmed.***

1951 Idaho Sess. Laws, ch. 200, § 1, pp. 423–24 (approved March 19, 1951) (emphasis added).

In its original form, Section 4 of the 1951 Ground Water Act[7] provided that:

> The right to the use of ground water of this state may be acquired only by appropriation. Such appropriation may be perfected by means of diversion and application to beneficial use or by means of the application permit and license procedure in this act provided. All proceedings commenced prior to the effective date of this act for the acquisition of rights to the use of ground water under the provisions of chapter 2 title 42, Idaho Code, may be completed under the provisions of said chapter 2 and rights to the use of ground water may be thereby acquired. ***But the administration of all rights to the use of ground water, whenever or however acquired or to be acquired, shall, unless specifically excepted therefrom, be governed by the provisions of this act.***

1951 Idaho Sess. Laws, ch. 200, p. 424 (emphasis added).

The emphasized language from Section 4 is still present in the statute despite numerous opportunities for the Legislature to remove it. The Ground Water Act was first amended in 1953, with the most notable change being the addition of language to Section 1, italicized in the following:

> Ground waters are public waters—It is hereby declared that the traditional policy of the state of Idaho, requiring the water resources of this state to be devoted to beneficial use in reasonable amounts through appropriation, is affirmed with respect to the ground water resources of this state as said term is hereinafter defined *and, while the doctrine of 'first in time is first in right' is recognized, a reasonable exercise of this right shall not block full economic development of underground water resources, but early appropriators of underground water shall be protected in the maintenance of reasonable ground water pumping levels as may be established by the state reclamation engineer as herein provided.* All ground waters in this state are declared to be the property of the state, whose duty it shall be to supervise their appropriation and allotment to those diverting the same for beneficial use. All rights to the use of ground water in this state however acquired before the effective date of this act are hereby in all respects validated and confirmed.

1953 Idaho Sess. Laws, ch. 182, § 1, p. 278 (approved March 12, 1953). The issue of a "reasonable ground water pumping level" is the focus of Part IV.B, but the issue of this provision's applicability to A&B's first argument will be dealt with here.

---

[7] Now codified as I.C. § 42-229.

A&B argues that the 1953 amendment to the GWA does not apply to any pre-1953 water rights. Idaho Code section 73-101 states that "[n]o part of these compiled laws is retroactive, unless expressly so declared." This tenet of statutory construction extends to statutory amendments. *Nebeker v. Piper Aircraft Corp.*, 113 Idaho 609, 614, 747 P.2d 18, 23 (1987) (holding that it is a long standing rule of this jurisdiction that an amendment to an existing statute will not be held to be retroactive in application absent an express legislative statement to the contrary).

However, the circumstances in *Nebeker* are distinguishable from the instant case. That case dealt with the retroactive application of a 1984 amendment to I.C. § 5-311, Idaho's wrongful death statute. *Id.* at 612, 747 P.2d at 21. Unlike the wrongful death statute, the Ground Water Act, when interpreted in its entirety, was made retroactive by the express language in Section 4 of the original act. "[T]he administration of all rights to the use of ground water, whenever or however acquired or to be acquired, shall, unless specifically excepted therefrom, be governed by the provisions of this act." 1951 Idaho Sess. Laws, ch. 200, p. 424. Unless a ground water right was "specifically excepted" from the requirements of Section 4, a ground water right would be subject to the provisions of the act. Since water right 36-2080 was not specifically excepted, it should be administered in accordance with the Ground Water Act.

### b. *Baker v. Ore-Ida Foods, Inc.*

As noted above, A&B argues in part that the "reasonable ground water pumping level" provision of the GWA does not apply to water rights that pre-date the enactment of the act. This issue was discussed in *Baker v. Ore-Ida Foods, Inc.*, where this Court interpreted for the first time the application of the GWA as it relates to withdrawals of water from an underground aquifer in excess of the recharge rate. 95 Idaho 575, 584, 513 P.2d 627, 636 (1973). In *Baker*, senior ground water users brought an action to enjoin junior users from pumping out of a common aquifer. *Id.* at 576–77, 513 P.2d at 628–29. The trial court granted the injunction, holding that the aquifer was being "mined" by over-pumping. *Id.* On appeal, the junior users argued that they were entitled to a pro rata share of the aquifer, and that I.C. § 42-226 superseded the common law. *Id.* This Court affirmed the trial court, but weighed in on the bounds of senior water users under the GWA.

> A senior appropriator is only entitled to be protected to the extent of the 'reasonable ground water pumping levels' as established by the [IDWR]. A senior appropriator is not absolutely protected in either his historic water level or his

10

> historic means of diversion. Our Ground Water Act contemplates that in some situations senior appropriators may have to accept some modification of their rights in [o]rder to achieve the goal of full economic development.
>
> . . .
>
> We conclude that our legislature attempted to protect historic water rights while at the same time promoting full development of ground water. Priority rights in ground water are and will be protected insofar as they comply with reasonable pumping levels. Put otherwise, although a senior may have a prior right to ground water, if his means of appropriation demands an unreasonable pumping level his historic means of appropriation will not be protected.

*Id*. at 584, 513 P.2d at 636 (internal citation omitted). The language from *Baker* lends credence to the notion that the "reasonable ground water pumping level" provision found in the 1953 amendment applies to all water rights, since the phrase "[p]riority rights in ground water are and will be protected insofar as they comply with reasonable pumping levels" is unequivocal.

### c.  *Parker v. Wallentine*

A&B argues that this Court's decision in *Parker v. Wallentine* confirms that the 1953 amendment's reasonable ground water pumping level provision does not apply to its 36-2080 water right. 103 Idaho 506, 650 P.2d 648 (1982). In *Parker*, the holder of a domestic well drilled in 1964 had his well dry up when an irrigation well drilled in 1976 was pumped. *Id*. at 507, 650 P.3d at 649. At issue was whether the 1978 amendment to the GWA protected the domestic user up to the user's historic pumping level or only up to a reasonable pumping level. *Id*. at 511–12, 650 P.2d at 653–54. The 1978 Amendment to the GWA is not pertinent to the instant case, but it exempted domestic wells from the permit requirements of I.C. § 42-229. 1978 Idaho Sess. Laws, ch. 324, § 1, p. 819 (approved March 29, 1978). A&B points to this Court's language in *Parker* that "[n]othing in the 1978 amendment or the circumstances of its enactment indicates that the legislature intended this amendment to have retroactive effect." 103 Idaho at 511 n.7, 650 P.2d at 653 n.7.

However, the holding in *Parker* is distinguishable from the present case since *Parker* deals with excepted domestic water rights while the present case deals with non-excepted water rights. In the context of the GWA, this is a fundamental difference. The retroactive language in the original Section 4, currently codified as I.C. § 42-229, states that the "administration of all rights to the use of ground water, whenever or however acquired or to be acquired, shall, unless specifically excepted therefrom, be governed by the provisions of this act."

### d.  *Musser v. Higginson*

11

A&B also relies on this Court's decision in *Musser v. Higginson* to bolster the argument that the GWA does not apply to pre-1951 water rights. 125 Idaho 392, 871 P.2d 809 (1994) (abrogated on other grounds by *Rincover v. State, Dept. of Finance*, 132 Idaho 547, 976 P.2d 473 (1999)). In reference to I.C. § 42-226, this Court stated that "[b]oth the original version and the current statute make it clear that this statute does not affect rights to the use of ground water acquired before the enactment of the statute." *Id*. at 396, 871 P.2d at 813. However, this pronouncement is dicta when viewed in context.

In *Musser*, the plaintiff sought a writ of mandamus to compel the Director to respond to a delivery call and administer a water right. *Id*. at 394, 871 P.2d at 811. The trial court issued the writ and IDWR appealed to this Court arguing that while the Director had a statutory duty to administer water within a water district, I.C. § 42-226 gave the Director discretion on whether to respond to delivery calls. *Id*. at 396, 871 P.2d at 813. The *Musser* opinion's treatment of I.C. § 42-226 was only in response to one of the defenses raised by the Director. The thrust of the opinion dealt with the Director's duties under I.C. § 42-602 and the principles of mandamus. Additionally, an interpretation of the GWA in *Musser* is immaterial after this Court's opinion in *Clear Springs Foods, Inc. v. Spackman*. 150 Idaho 790, 252 P.3d 71 (2011). In *Clear Springs*, this Court held that I.C. § 42-226 has no application in delivery calls between senior spring users and junior ground users. *Id*. at 808, 252 P.3d at 89.

### e. The 1987 Amendment to the GWA

In 1987, the Legislature amended the GWA into its current form. 1987 Idaho Sess. Laws, ch. 347, § 3, p. 744 (approved April 6, 1987). The amendments generally concerned the use of low temperature geothermal ground water sources, which were to be governed under the newly created I.C. § 42-233. *Id*. The amendment also changed the last sentence of Section 1 of the original act to read:

> ~~All~~ This act shall not affect the rights to the use of ground water in this state ~~however~~ acquired before ~~the effective date of this act are hereby in all respects validated and confirmed~~ its enactment.

1987 Idaho Sess. Laws, ch. 347, § 1, at 743. This language is contained in the currently titled I.C. § 42-226.

A&B argues that a plain reading of this new phrase precludes the Director from applying the GWA to water right 36-2080, since it was acquired before the act was enacted. IDWR responds that these changes have no effect on non-excepted ground water rights.

12

In its treatment of the issue, the district court looked at the intent behind the statutes.[8] However, since the statutory language is plain, such an analysis by this Court would be improper. The current GWA states that the "administration of all rights to the use of ground water, whenever or however acquired or to be acquired, shall, unless specifically excepted therefrom, be governed by the provisions of this act." *See* I.C. § 42-229. Since a delivery call is an administration of a water right, *see American Falls Reservoir District No. 2 v. Idaho Department of Water Resources*, 143 Idaho 862, 876–77, 154 P.3d 433, 447–48 (2007), a plain reading of the statute would reveal that the GWA governs delivery calls unless a water right is specifically excepted. The 1987 amendment added that "[t]his act shall not affect the rights to the use of ground water in this state acquired before its enactment." I.C. § 42-226. Given the language used in the 1987 amendment, it appears that it pertains to the use of water, not to the administration of a water right. Generally, the more specific statute controls. *See Farber v. Idaho State Ins. Fund*, 147 Idaho 307, 313, 208 P.3d 289, 295 (2009) (abrogated on other grounds by *Verska v. Saint Alphonsus Reg'l Med. Ctr.*, 151 Idaho at 895, 265 P.3d at 508 (2011)). The retroactive language in I.C. § 42-229 specifically deals with the administration of water rights, while a plain interpretation of the 1987 amendment to the GWA shows the amendment to be an acknowledgement that some ground water rights were acquired in this state before enactment of the amendment.

This Court finds that a plain reading of the GWA, I.C. §§ 42-226 to 42-239, shows that the act applies to the administration of all ground water rights in the state; therefore it applies to A&B's water right 36-2080.

**B. The Director did not err in finding that A&B has not been required to pump water beyond a "reasonable ground water pumping level" even though the Director failed to identify a specific pumping level.**

Idaho Code section 42-226 states, in part, that "[p]rior appropriators of underground water shall be protected in the maintenance of reasonable ground water pumping levels as may

---

[8] According to the district court:

> [T]he more plausible justification behind the amendment and its choice of language was to avoid confusion with the forthcoming SRBA. Namely, that the validated and confirmed language could be construed as a legislative determination of the validity of pre-existing rights. Accordingly, the Court concludes that both the original language and the 1987 amendment were not intended to exempt pre-existing rights from the application of the GWA but rather to establish that pre-existing rights were acknowledged as valid and not supplanted by the operation of the GWA.

be established by the director of the department of water resources as herein provided." In his Final Order, the Director accepted the Hearing Officer's conclusions of law, but declined to establish a "reasonable ground water pumping level." On judicial review, the district court held that the GWA gives the Director discretion whether to establish ground water levels in conjunction with a delivery call. Additionally, the district court held that ground water pumping levels "have never been treated as an element of a water right, nor have pumping levels been memorialized in any decree or license." A&B argues that the failure to identify a "reasonable ground water pumping level" violated the Director's duty to administer water rights pursuant to Idaho law, and that the Director's failure to disclose the factual basis for this finding violated the IDAPA.

      1. <u>Whether the Director's decision not to identify a reasonable groundwater pumping level violated Idaho law.</u>

A&B argues that the district court wrongly relied on language in I.C. § 42-237a(g) to hold that the Director has discretion whether or not to set a reasonable pumping level. Idaho Code section 42-237a(g) states in pertinent part that:

> In the administration and enforcement of this act and in the effectuation of the policy of this state to conserve its ground water resources, the director of the department of water resources in his sole discretion, is empowered:
>
> . . . .
>
> g. To supervise and control the exercise and administration of all rights to the use of ground waters and in the exercise of this discretionary power he may initiate administrative proceedings to prohibit or limit the withdrawal of water from any well during any period that he determines that water to fill any water right in said well is not there available. To assist the director of the department of water resources in the administration and enforcement of this act, and in making determinations upon which said orders shall be based, he may establish a ground water pumping level or levels in an area or areas having a common ground water supply as determined by him as hereinafter provided. Water in a well shall not be deemed available to fill a water right therein if withdrawal therefrom of the amount called for by such right would affect, contrary to the declared policy of this act, the present or future use of any prior surface or ground water right or result in the withdrawing of the ground water supply at a rate beyond the reasonably anticipated average rate of future natural recharge.

A&B argues that this statute does not trump the Idaho Constitution, which states that "[p]riority of appropriation shall give the better right as between those using the water." Idaho Const. art. XV § 3. Nor would it trump the duties imposed on the Director by I.C. § 42-607, which requires the Director to distribute water in a water district by priority. IDWR responds that the Director

14

must administer water rights, but that he is not mandated to curtail junior ground water users simply because there is a delivery call.

In this regard IDWR is correct. A plain reading of the duties of the Director reveals that he has a duty to respond to a delivery call and determine whether the right holder is injured, but that he is not obligated to establish a reasonable ground water pumping level.

> 2. <u>Whether the Director's decision was supported by substantial and competent evidence.</u>

In his Final Order, the Director concluded that "[t]here is no indication that ground water levels in the ESPA exceed reasonable pumping levels required to be protected under the provisions of Idaho Code § 42-226." A&B argues that the Director's failure to identify a "reasonable ground water pumping level" was erroneous, arbitrary, and capricious. An action is capricious if it was done without a rational basis. *Am. Lung Ass'n of Idaho/Nevada v. State, Dept. of Agric.,* 142 Idaho 544, 547, 130 P.3d 1082, 1085 (2006) (citing *Enterprise, Inc. v. Nampa City,* 96 Idaho 734, 536 P.2d 729 (1975)). It is arbitrary if it was done in disregard of the facts and circumstances presented or without adequate determining principles. *Id.*

As a starting point, A&B argues that the Director's finding is not supported by the record. Principally, that the Hearing Officer urged the Director to establish a standard to ensure predictability regarding pumping levels:

> A process to establish reasonable pumping levels should be undertaken. The level of knowledge concerning the hydrology of the aquifer, the costs of deepening wells, the costs of pumping from deeper levels, and the likelihood of success in that pursuit has increased dramatically since the beginning of Unit B. Flow patterns and the effects of withdrawals from one area on another are understood at a much higher level. There should be some predictability as to how far down a pumper must go and when the protection of reasonable pumping levels has been reached.

A&B argues that the Director acted arbitrarily when he concluded that "[t]here is no indication that ground water levels in the ESPA exceed reasonable pumping levels required to be protected under the provisions of Idaho Code § 42-226." However, the above excerpt from the Hearing Officer does not state that the Director needs to set a reasonable pumping level, just that the process of finding such a level should be started.

The Director ultimately declined to establish a reasonable groundwater pumping level. A&B argues that this failure to set a reasonable pumping level makes it impossible for the Director to determine if there is material injury, or for an appellate court to review the Director's

15

conclusions. Additionally, A&B argues that the lack of a reasonable pumping level makes it impossible for IDWR to provide any factual argument that such a pumping level has not been reached.

A&B also argues that the Director's refusal to set a reasonable pumping level unlawfully forces A&B to self-mitigate for declining water levels, in contravention of its senior water right; "Based upon the Director's arbitrary finding, A&B must apparently continue to drill and pump from an unknown depth in the aquifer before he will administer junior water rights." An analysis of A&B's arguments begins with the Hearing Officer's findings.

*a. Hearing Officer's Findings*

The Director's Final Order accepted the factual findings of the Hearing Officer's Recommendations. Among them: that the aquifer is not being "mined," since more water enters the aquifer than is being removed by groundwater pumping; that A&B currently operates 177 wells but is authorized to operate 188 if needed; that initial drillings were often inadequate; and that A&B has problems with certain well systems in the southern portion of the project where sedimentary deposits and thick layers of basalt are present. Most significantly, the Hearing Officer found that A&B has not been required to exceed reasonable pumping levels:

> A&B has not been required to exceed reasonable pumping levels. The condition of water in the aquifer is not such that A&B can say its need to pursue the water further is over. If deepening wells is necessary to produce the amount of water A&B is entitled to under the water right, that burden remains with A&B until it is established that it is unreasonable to drill deeper. Its efforts at rectification have been largely successful, indicating that there is water available if the proper efforts to secure it are pursued. However, A&B and other pumpers need standards to know when further efforts remain their responsibility and when that additional cost and effort passes to junior users.

Based on the factual record before him, it seems that the Director determined by logical inference that the pumping level has not exceeded a reasonable level. Since the Director has discretion on whether or not to set a reasonable pumping level, this conclusion is within his authority.

Therefore, this Court finds that the Director based his decision that A&B did not exceed reasonable pumping levels on substantial and competent evidence regarding A&B's water use, the unique geologic conditions in the area, and the finding that the aquifer is not being mined.

**C. The Director did not err in failing to analyze water availability at the 177 individual wells for purposes of an injury analysis to A&B's senior water right. As a corollary,**

16

**the Director properly applied the CM Rules by finding that A&B must interconnect individual wells or well systems across the project before a delivery call can be filed.**

The district court found that the Director did not err by failing to separately consider each well individually to determine a material injury under the 36-2080 water right, because the system must be considered as a whole based on the way in which the water right is decreed. A&B argues that this finding is arbitrary and capricious, because it failed to consider A&B's actual diversions and water use. Specifically, that "A&B has never – at any point in its history – had the ability to pump water at one well or well system and deliver that water to any acre throughout the project. Just the opposite, each of the well systems delivers water to specific acres and specific water users."

1. Whether the Director erred in analyzing water right 36-2080 as a whole system as opposed to 177 individual wells.

According to A&B, the project's individual well systems cannot provide water to all acres throughout the project.[9] The Hearing Officer addressed some of the potential limitations on interconnection in his Recommendations:

---

[9] A&B cites the hearing testimony of Tim Luke, IDWR's Water Distribution Section Manager, who testified that water cannot be pumped from any well and delivered to any acre on the project. However, this testimony demonstrates that interconnection is possible.

Q. And you recognize, I guess, based upon your knowledge of the A & B project that certain lands in A & B are served by certain wells?

A. True.

Q. And that -- you would agree that any acre under the project cannot be physically served with water from any well? Depends on where you're at?

A. Any well owned by A & B?

Q. Correct.

A. I'm aware that there are specific wells -- A & B wells that serve certain lands in A & B. And that's generally where -- well, I guess just that.

Q. Well, Mr. Bromley talked to you about the water right and the fact that the water right doesn't describe particular lands to particular points of diversion.

A. Correct.

Q. And that under the water right you could divert water from any well and apply it to any acre. My question to you, is that your understanding of how the A & B project operates as it exists today?

A. Yeah. There's 177 wells and 62,000 acres. I realize that certain areas of the project are irrigated by certain wells. It's not to say you can't add a well or move water from one well that was formerly serving or is serving lands that I would describe as Area A couldn't be moved to lands in Area B within the district.

Consideration of the system as a whole must also account for the effect upon individual systems when the number of short systems would constitute a failure of the project. The geography of the land within Unit B, the design of the system, and the practices in utilizing the system prior to entry of the partial decree indicate that the water right adjudicated is not satisfied by showing that the combined total of water that can be pumped from all the wells is equal to the amount necessary to avoid material injury if the water were equally distributed. It is proper to consider the entire system, but that consideration must account for the fact that water from one pump is not accessible to the entire acreage. Pumping water from wells in excess of what can be beneficially used on the property to which the water can be delivered would be waste, so counting excess water that cannot be utilized towards the water right would be improper. The theoretical right to apply the water from any pump to any land must be tempered by the reality of the system as it was designed and utilized and partially decreed. If the entire well system could be interconnected economically the issue of material injury would be gauged by the total capacity of the system to produce water.

The Hearing Officer went on to note that there is uncertainty as to whether large portions of the project can be interconnected, and that A&B would not be required to connect every point of diversion. However, the Hearing Officer also found that these issues would not relieve A&B of certain obligations:

Considering the fact that the project was developed, licensed and partially decreed as a system of separate wells with multiple points of diversion, it is not A&B's obligation to show interconnection of the entire system to defend its water rights and establish material injury. However, it is equally clear that the licensing requested by the Bureau of Reclamation envisioned flexibility in moving water from one location to another. Consequently, there is an obligation of A&B to take reasonable steps to maximize the use of that flexibility to move water within the system before it can seek curtailment or compensation from junior users.

It seems clear that the Hearing Officer's findings conclude that A&B does not have to interconnect the entire system, but must take reasonable steps to divert some water throughout

---

Q. Physically that could happen. But as the project exists, do you understand that any acre under the project can be irrigated by water from any well as the project exists?

A. Yeah, it could.

Q. How is that?

A. It's within your water right to do that.

. . .

Q. So it's your testimony that you think any acre under the project could be irrigated with any well as the project exists today? I'm not talking about theoretical or what could happen if --

A. Not necessarily any acre, but some acres have been irrigated by different wells over time.

18

the project before junior members are impacted. Those reasonable steps are, again, a finding of fact for the Director. This is consistent with the way water right 36-2080 was decreed by the SRBA.

### a. SRBA Decree of A&B's water right 36-2080

The district court found that the "way in which the 36-2080 water right was licensed and ultimately decreed in the SRBA is not typical." The partial decree does not define or limit the place of use for any individual point of diversion. Rather, the partial decree lists the place of use as "within the boundary of A & B irrigation district service area, pursuant to section 43-323, Idaho Code. This right is limited to the irrigation of 62,604.3 acres within the A & B irrigation district boundary in a single irrigation season." The district court held that the legal effect of the SRBA partial decree "is that water diverted from any one of the points of diversion is appurtenant to and therefore can be used on any and all of the 62,604.3 acres within the defined place of use." As mentioned above, this arrangement was intentional. In a response to IDWR regarding the original permitting for the project, USBR stated that "[w]e emphasize that the project is one integrated system, physically, operationally, and financially. . . . Therefore it is impractical and undesirable to designate precise land areas within the project served by each of the specific wells on the list." Additionally, the SRBA partial decree notes the total quantity of the right, 1,100 cubic feet per second (cfs) with a limitation of 250,417.20 acre feet per year (afy), but it does not provide any specific rates of diversion from any of the individual wells.

A plain reading of the SRBA partial decree in conjunction with the Hearing Officer's findings provides ample support to the Director's Final Order. Therefore, we find that the Director's decision to analyze A&B's water right on a system-wide basis was not arbitrary and capricious, but rather it was based on a reasoned analysis of water right 36-2080 as it was permitted and partially decreed.

2. Whether the Director unconstitutionally applied the CM Rules by finding that A&B must interconnect individual wells or well systems across the project before a delivery call can be filed.

In his recommendations, the Hearing Officer found that "there is an obligation of A&B to take reasonable steps to maximize the use of [interconnection] to move water within the system before it can seek curtailment or compensation from juniors." The Director accepted this finding in his Final Order. A&B argues that Idaho law does not require A&B to interconnect its separate points of diversion as a condition to administer junior priority ground water rights.

19

The argument advanced by A&B has four parts. First, that a mandate of interconnection as a prerequisite of administration is an unconstitutional application of the CM Rules. Second, that the actions of the Director contradict the plain language of A&B's water right decree from the SRBA. Third, that there is no mention in the Idaho Code or in the CM Rules of a senior right holder's need to interconnect as a condition of administration with juniors. And fourth, that the act of interconnection of the A&B project will not address the problem of diminishing groundwater supply.

### a. A&B's argument that a mandate of interconnection is unlawful.

A&B argues that Idaho is a prior appropriation state, and that the denial of its delivery call on the basis of a new condition to administration unlawfully diminishes A&B's priority. *See* Idaho Const. art. XV, § 3 ("Priority of appropriation shall give the better right as between those using the water . . . ."). "Priority in time is an essential part of western water law and to diminish one's priority works an undeniable injury to that water right holder." *Jenkins v. State, Dept. of Water Res.*, 103 Idaho 384, 388, 647 P.2d 1256, 1260 (1982). This argument has two sub-parts.

### i. A&B's argument that the actions of the Director contradict the SRBA partial decree.

In this argument, A&B claims that the Director violated the plain terms of the SRBA partial decree by reading into the decree a condition that is not spelled out. A decree entered in a general adjudication shall be conclusive as to the nature and extent of all water rights in the adjudicated water system. I.C. § 42-1420(1).

> [A] provision is to be included in a decree if it is necessary to define or for the efficient administration of a water right, and it is not necessary that the provision apply to all water rights. Therefore, if the provision is necessary for the efficient administration of a water right, we hold that the provision should be included in the decree, and remand for further factual findings as to the necessity of this provision either to the definition or the administration of these water rights.

*State v. Nelson*, 131 Idaho 12, 16, 951 P.2d 943, 947 (1998) (internal citation omitted). A&B argues that absent a limitation or condition on the decree, the Director had no authority to deny A&B's request for administration on the basis of interconnection.

Ultimately the answer to this argument is the same as the answer in the following subpart ii. That is, whether the Director's discretion includes the ability to require reasonable methods of diversion and application by a senior right holder.

20

The CM Rules provide a list of the factors that the Director may consider in his determination of a senior right holder's material injury.[10] The most pertinent provision is IDAPA Rule 37.03.11.042(g) which allows the Director to consider "[t]he extent to which the requirements of the holder of a senior-priority water right could be met with the user's existing facilities and water supplies by employing reasonable diversion and conveyance efficiency and conservation practices." This Court's holding in *American Falls* touched on this very topic. The CM Rules "give the Director the tools by which to determine 'how the various ground and surface water sources are interconnected, and how, when, where and to what extent the diversion and use of water from one source impacts [others].'" *American Falls*, 143 Idaho at 878, 154 P.3d at 449 (quoting *A & B Irrigation Dist. v. Idaho Conservation League*, 131 Idaho 411, 422, 958

---

[10] IDAPA Rule 37.03.11.042 states in pertinent part:

01. Factors. Factors the Director may consider in determining whether the holders of water rights are suffering material injury and using water efficiently and without waste include, but are not limited to, the following:

a. The amount of water available in the source from which the water right is diverted.

b. The effort or expense of the holder of the water right to divert water from the source.

c. Whether the exercise of junior-priority ground water rights individually or collectively affects the quantity and timing of when water is available to, and the cost of exercising, a senior-priority surface or ground water right. This may include the seasonal as well as the multi-year and cumulative impacts of all ground water withdrawals from the area having a common ground water supply.

d. If for irrigation, the rate of diversion compared to the acreage of land served, the annual volume of water diverted, the system diversion and conveyance efficiency, and the method of irrigation water application.

e. The amount of water being diverted and used compared to the water rights.

f. The existence of water measuring and recording devices.

g. The extent to which the requirements of the holder of a senior-priority water right could be met with the user's existing facilities and water supplies by employing reasonable diversion and conveyance efficiency and conservation practices; provided, however, the holder of a surface water storage right shall be entitled to maintain a reasonable amount of carry-over storage to assure water supplies for future dry years. In determining a reasonable amount of carry-over storage water, the Director shall consider the average annual rate of fill of storage reservoirs and the average annual carry-over for prior comparable water conditions and the projected water supply for the system.

h. The extent to which the requirements of the senior-priority surface water right could be met using alternate reasonable means of diversion or alternate points of diversion, including the construction of wells or the use of existing wells to divert and use water from the area having a common ground water supply under the petitioner's surface water right priority.

P.2d 568, 579 (1997)). The Director did not impose a new condition, but rather he used his discretion to analyze A&B's delivery call using his statutory authority in the manner governed by the CM Rules.

> ii. *A&B's argument that there is no mention in Idaho law of a senior right holder's need to interconnect as a condition of administration.*

A&B argues that there is no language in I.C. §§ 42-602, 607, or CM Rule 40 that would require A&B to interconnect its system as a condition to administration. A&B believes that this precondition to administration shifts a burden onto A&B in violation of this Court's opinion in *American Falls*. *See* 143 Idaho at 877–78, 154 P.3d at 448–49 ("The Rules should not be read as containing a burden-shifting provision to make the petitioner re-prove or re-adjudicate the right which he already has.").

The answer here is the same as that in the subsection directly above. Idaho law does not explicitly state that interconnection is a condition of administration, but the CM Rules allow the Director to consider reasonable diversion in his determinations.

> b. *A&B's argument that interconnection of their water system will not address the issue of diminishing groundwater supply.*

Finally, A&B argues that interconnection will not solve the ultimate problem of diminishing water supply and would negatively impact the district's landowners: "Attempting to move water from one well system to another . . . would only further reduce the amount of water available for delivery to all landowners served by those wells." In the Hearing Officer's findings presented above, it appears that there is no issue of diminishing ground water supply, as there was a specific finding that the aquifer is not being mined. Absent findings that A&B has exceeded a reasonable pumping level, there does not appear to be any evidence to support A&B's argument. Additionally, IDWR points out that A&B seeks to curtail junior users while it simultaneously irrigates junior and enlargement acres. If water supply was an issue for A&B, it seems unlikely that they would continue this practice.

Given the language in the CM Rules, we find that the Director did not act arbitrarily or violate Idaho law when he found that A&B must work to reasonably interconnect some individual wells or well systems before a delivery call can be filed, and we affirm the district court's finding in this regard.

**D. The district court did not err in imposing the "clear and convincing" evidence standard on the Director's determination of material injury in a delivery call.**

22

In its Memorandum and Order on Petition for Judicial Review, the district court held that "clear and convincing" was the proper evidentiary standard to determine material injury in a delivery call. Pocatello and IGWA both appeal, arguing that the application of a higher evidentiary standard is not supported by Idaho law. As Pocatello argues, the clear and convincing evidence standard has only been applied in the context of adjudications or re-adjudications which serve to permanently deprive a water right holder of a decreed property right.

This Court has free review over questions of law. *Rahas v. Ver Mett*, 141 Idaho 412, 414, 111 P.3d 97, 99 (2005). In *State v. Kimball*, this Court held that "[c]lear and convincing evidence is generally understood to be 'evidence indicating that the thing to be proved is highly probable or reasonably certain.'" 145 Idaho 542, 546, 181 P.3d 468, 472 (2008) (quoting *In re Adoption of Doe*, 143 Idaho 188, 191, 141 P.3d 1057, 1060 (2006)). In Idaho, "[a] subsequent appropriator attempting to justify his diversion has the burden of providing that it will not injure prior appropriations." *Cantlin v. Carter*, 88 Idaho 179, 186, 397 P.2d 761, 765-66 (1964) (superseded by statute, I.C. § 42-103 (1971)). Idaho law also provides that the burden of establishing waste is on the junior appropriator. *Gilbert v. Smith*, 97 Idaho 735, 739, 552 P.2d 1220, 1224 (1976). Pocatello argues that no evidentiary standard, "no matter how strict or relaxed," can change the allocation of burden of persuasion in administrative law, since the burdens are defined in the rules. IDAPA Rule 37.03.11.042, which is stated in its entirety in Part IV.C.2 above, governs the Director's determination of material injury and reasonableness of water diversions.

1. Analysis of the District Court

The district court stated that the clear and convincing evidence standard applied to a finding of injury "based on the way in which the right is structured and in giving proper legal effect to the decree . . . ." Such a standard, according to the district court, gives the "proper presumptive weight to a decree." In assigning an evidentiary standard, the district court focused on the presumptions and burdens of proof found in the CM Rules and applicable case law.

The reasoning behind the district court's decision can be summed up in the following excerpt:

> The application of the clear and convincing standard of proof only makes sense from a common sense perspective. If the Director determines that a senior can satisfy the decreed purpose of use on less than the decreed quantity reflected,

23

he needs to be certain to a standard of clear and convincing evidence. In making a determination of whether or not to regulate juniors, the Director is required to evaluate whether the quantity available meets or exceeds the quantity the senior can put to beneficial use. If the Director regulates juniors to satisfy the senior's decreed quantity there is no risk of injury to the senior. However, if the Director regulates juniors to satisfy a quantity less than decreed, there is risk to the senior that the Director's determination is incorrect. There is no remedy for the senior if the Director's determination turns out to be in error and the senior comes up short of water during the irrigation season. Any burden of this uncertainty should be borne by the junior . . . . [I]f the Director's determination is only based on a finding 'more probable than not.' The senior's right is put at risk and the junior is essentially accorded the benefit of uncertainty. The requisite high standard accords appropriate presumptive weight to the decree.

The district court also noted several opinions from this Court that use the clear and convincing standard in connection with water rights. Forfeiture or abandonment of a water right must be established by clear and convincing evidence. *See Crow v. Carlson*, 107 Idaho 461, 467, 690 P.2d 916, 922 (1984). That same standard is used when establishing prescriptive title to the water right of another. *See Gilbert,* 97 Idaho at 739, 552 P.2d at 1224. Significantly, these cases deal with the actual modification of a water right. In its decision, the district court held that the futile delivery call defense was similar and "requires a showing of clear and convincing evidence that diversions by a junior appropriator will not injure the rights of a senior appropriator." Additionally, the district court held that a "determination that a portion of a decreed water right is being wasted (or is not being put to beneficial use) is a diminishment of a property right. The decreed quantity is reduced by the amount determined not being put to beneficial use."

2. Analysis of Applicable Case Law.

    a. *American Falls Reservoir District No. 2 v. Idaho Department of Water Resources*

Although mainly focused on issues of burden shifting, this Court's decision in *American Falls* touched on the issue of evidentiary standards. In *American Falls*, the American Falls Reservoir District and others sought a declaratory judgment that the CM Rules were unconstitutional. 143 Idaho at 867–68, 154 P.3d at 438–39. This Court ultimately concluded that the CM Rules were facially constitutional. *Id*. at 881, 154 P.3d at 452. To reach that conclusion, this Court touched on the topic of applicable evidentiary standards. *Id*. at 876–77, 154 P.3d at 447–48. However, this Court did not rule on whether the CM Rules were constitutional "as applied," since administrative remedies were not exhausted. *Id*. at 870–71,

24

154 P.3d at 441–42. Thus, *American Falls* did not provide any exact insight into the proper evidentiary standards for the CM Rules, although the opinion noted that "[r]equirements pertaining to the standard of proof and who bears it have been developed over the years and are to be read into the CM Rules." *Id*. at 874, 154 P.3d at 445.

As part of this analysis in *American Falls*, this Court also pointed out an important distinction:

> [T]he water rights adjudications neither address, nor answer, the questions presented in delivery calls; thus, responding to delivery calls, as conducted pursuant to the CM Rules, do not constitute a re-adjudication. For example, the SRBA court determines the water sources, quantity, priority date, point of diversion, place, period and purpose of use. However, reasonableness is not an element of a water right; thus, evaluation of whether a diversion is reasonable in the administration context should not be deemed a re-adjudication. Moreover, a partial decree need not contain information on how each water right on a source physically interacts or affects other rights on that same source.

*Id*. at 876–77, 154 P.3d at 447–48 (internal citations omitted). Additionally, this Court held that the CM Rules cannot be read as burden shifting provisions that would require the senior right holder to re-adjudicate his right. *Id*. at 877–78, 154 P.3d at 448–49. The distinction between the adjudication of a water right and an administration of that water right is a critical element in this analysis.

### b. Previous Case Law

As noted in *American Falls*, this Court has previously stated the appropriate evidentiary standard to be used under the CM Rules. In *Moe v. Harger*, this Court dealt with a conflict between senior and junior appropriators of surface water from the Big Lost River. 10 Idaho 302, 77 P. 645 (1904). In *Moe*, the junior appropriators sought to divert water from the river before the water reached Moe, the senior appropriator. *Id*. at 307, 77 P. at 646. This Court stated the issue as follows, "Appellants complain of the action of the trial court in incorporating in the decree in this case an order perpetually enjoining them from in any manner interfering with or diverting or using the waters of Lost river, except in accordance with the terms of the decree." *Id*. at 306, 77 P. at 647. In upholding the injunction, this Court stated as follows:

> So soon as the prior appropriation and right of use is established, it is clear, as a proposition of law, that the claimant is entitled to have sufficient of the unappropriated waters flow down to his point of diversion to supply his right, and an injunction against interference therewith is proper protective relief to be granted. *The subsequent appropriator who claims that such diversion will not*

25

*injure the prior appropriator below him should be required to establish that fact by clear and convincing evidence.*

*Id.* at 307, 77 P. at 647 (emphasis added). In weighing the evidence, this Court determined that clear and convincing evidence was necessary for the junior appropriators to prevail:

> This court has uniformly adhered to the principle, announced both in the Constitution and by the statute, that the first appropriator has the first right; and it would take more than a theory, and in fact clear and convincing evidence, in any given case, showing that the prior appropriator would not be injured or affected by the diversion of a subsequent appropriator, before we would depart from a rule so just and equitable in its application, and so generally and uniformly applied by the courts.

*Id.* at 307, 77 P. at 646–47.

This Court next addressed the standard of proof in *Josslyn v. Daly*, 15 Idaho 137, 96 P. 568 (1908). One of the issues in that case was the right to water from a spring and a lake located in a valley through which a creek flowed. *Id.* at 147, 96 P. at 571. The trial court held that the spring was not tributary to the creek and that all waters used by the plaintiff-respondent from the lake flowed back into the creek, without lessening or diminishing the flow in the creek. *Id.* at 148, 96 P. at 571. It therefore held that the plaintiff was entitled to use the water from the spring and the lake. *Id.* We held that because the case had to be retried on other issues, "we think it best to also order a new trial as to the volume and flow of water from this spring and lake, and also on the issue as to whether these are in fact tributary and feeders to the waters of Seaman's creek." *Id.* We then held that where a junior appropriator seeks to divert water from tributaries to the main stream, the junior appropriator must prove by clear and convincing evidence that it does not diminish the volume of water in the main stream. We stated:

> It seems self-evident that to divert water from a stream or its supplies or tributaries must in a large measure diminish the volume of water in the main stream, and where an appropriator seeks to divert water on the grounds that it does not diminish the volume in the main stream or prejudice a prior appropriator, he should, as we observed in *Moe v. Harger*, 10 Ida. 305, 77 Pac. 645, produce "*clear and convincing evidence showing that the prior appropriator would not be injured or affected by the diversion.*" The burden is on him to show such facts.

*Id.* at 149, 96 P. at 571–72 (emphasis added).

Subsequently, this Court's opinion in *Hill v. Green*, "involve[d] the right to the use of certain of the waters of Indian Creek, a tributary of Medicine Lodge Creek, in Clark county." 47 Idaho 157, 158, 274 P. 110, 110 (1928). After the spring runoff, "a great part of Indian Creek becomes wholly lost by percolation into its [porous] bed before its juncture with Medicine Lodge

26

Creek." *Id*. at 159, 274 P. at 110. The junior appropriators and their predecessors in interest constructed irrigation works to divert water from Indian Creek, and the senior appropriators, who had prior rights in Medicine Lodge Creek, contended that the junior appropriators were taking water that would eventually flow into Medicine Lodge Creek. The district court found that the junior appropriators were not taking any water that would ultimately be available for use by the senior appropriators. It found that "the water table in this vicinity is such that no water lost by percolation ever finds its way back into the bed of Indian Creek or into Medicine Lodge Creek, nor is there any subterranean flow supporting the surface flow." *Id*. The senior appropriators appealed, stating that the two issues on appeal were:

> First, whether or not respondents, as a matter of law, can gain a superior right over prior appropriators from Medicine Lodge Creek by salvaging the waters as in their complaint alleged; and, second, if such a superior right can be so acquired, is the evidence of that *clear and convincing kind required to justify the court in awarding them such a superior right*.

*Id*. at 160, 274 P. at 110 (emphasis added). This Court affirmed the district court, stating:

> There is no question but that the burden of proof rested upon respondents to show by competent evidence that the water salvaged by them had not theretofore been appropriated or used by others with prior rights. It being shown, however, that the water salvaged would not, if undisturbed, reach the point of diversion of prior appropriators, their supply would not be decreased, and they have therefore, no cause for complaint.

*Id*. at 160, 274 P. at 111.

In *Silkey v. Tiegs*, we again addressed the standard of proof, this time in administering water rights between or among groundwater users. 54 Idaho 126, 28 P.2d 1037 (1934). The users' respective water rights had been previously adjudicated, and the court retained jurisdiction for two years to determine whether there was sufficient subterranean water for the junior appropriators to take any water from their wells. *Id*. at 127, 28 P.2d at 1037. Prior to the expiration of that two-year period, the junior appropriators filed a motion contending that the prior appropriator had never been able to obtain more than 21 inches of the 40 inches of water she had been decreed, that there were at least 140 inches of water available in the aquifer, and that they should be permitted to withdraw at least 60 inches of water because it would not harm the senior appropriator. *Id*. at 128, 28 P.2d at 1037–38. The trial court denied their motion, and the junior appropriators appealed. We affirmed the standard of proof that they were required to

27

show by clear and convincing evidence that their withdrawal of the water would not harm the senior appropriator.

> The trial court by denying appellants' motion herein indicated he was not satisfied the provisional tests entitled them to more water, without interference with respondent's prior right. The burden was on appellants herein to sustain their motion by direct and convincing testimony, this language in *Moe v. Harger*, 10 Idaho 302, 77 P. 645, being particularly apt:
>
> "This court has uniformly adhered to the principle announced both in the constitution and by the statute that the first appropriator has the first right; and it would take more than a theory, and, in fact, *clear and convincing evidence*, in any given case, showing that the prior appropriator would not be injured or affected by the diversion of a subsequent appropriator, before we would depart from a rule so just and equitable in its application and so generally and uniformly applied by the courts. Theories neither create nor produce water, and when the volume of a stream is diverted and seventy-five per cent of it never returns to the stream, it is pretty clear that not exceeding twenty-five per cent of it will ever reach the settler and appropriator down the stream and below the point of diversion by the prior user."

*Id*. at 128–29, 28 P.2d at 1038 (citation omitted) (emphasis added).

We again affirmed the clear and convincing standard of proof in *Cantlin v. Carter*. 88 Idaho 179, 397 P.2d 761 (1964). There, the appellant had obtained a permit to appropriate water from what he described as a swamp. *Id*. at 182, 397 P.2d at 762. Prior appropriators of water from a ditch objected on the ground that the water sought to be appropriated was seepage water from the ditch which they used. *Id*. The State Reclamation Engineer canceled the permit, and the matter was appealed. *Id*. at 182, 397 P.2d at 762–63. We affirmed, and in doing so reaffirmed the clear and convincing standard of proof stated in *Moe v. Harger*, *Josslyn v. Daly*, and *Silkey v. Tiegs*:

> A subsequent appropriator attempting to justify his diversion has the burden of proving that it will not injure prior appropriations. *Moe v. Harger*, 10 Idaho 302, 77 P. 645; *Josslyn v. Daly*, 15 Idaho 137, 96 P. 568; *Jackson v. Cowan*, 33 Idaho 525, 196 P. 216; *Silkey v. Tiegs*, 54 Idaho 126, 28 P.2d 1037. In *Josslyn v. Daly*, supra, at 15 Idaho 149, 96 P. at 571, this court stated:
>
> > '* * * It seems self-evident that to divert water from a stream or its supplies or tributaries must in a large measure diminish the volume of water in the main stream, and, where an appropriator seeks to divert water on the grounds that it does not diminish the volume in the main stream or prejudice a prior appropriator, he should, as we observed in *Moe v. Harger*, 10 Idaho 305, 77 Pac. 645, produce '*clear and convincing evidence* showing that the prior appropriator

would not be injured or affected by the diversion.' The burden is on him to show such facts.'

*Id*. at 186–87, 397 P.2d at 765–66.

### c. *Nebraska v. Wyoming*

In support of their argument for a preponderance standard, Pocatello and IGWA cite to the United States Supreme Court opinion in *Nebraska v. Wyoming* (*Nebraska II*). 507 U.S. 584 (1993). In *Nebraska II*, the Court dealt with an ongoing interstate dispute between Nebraska, Wyoming, and Colorado over water rights to the North Platte River. *Id*. at 584. In 1945, the Court entered a decree that imposed storage and diversion restrictions on the upstream states, Colorado and Wyoming, and apportioned the natural flow of the water between Wyoming and Nebraska. *Id*. In 1986, Nebraska petitioned the Court for an enforcement order seeking injunctive relief and alleging that Wyoming was violating the 1945 decree. Wyoming countered, arguing that Nebraska had circumvented the decree by diverting waters for uses not recognized by the decree. *Id*. at 589.

As a starting point, the Supreme Court found the proper legal standards by which it could resolve the interstate dispute.

> The disagreement in this case centers on the applicable legal standards. The question is whether these proceedings involve an application for *enforcement* of rights already recognized in the decree, or whether Nebraska seeks a *modification* of the decree. According to Wyoming, although the Court has jurisdiction to modify the decree under Paragraph XIII, Nebraska obtained leave to file its petition on the assurance that the case would involve only enforcement of existing rights. In Wyoming's view, Nebraska subsequently, and improperly, transformed the case into a request for recognition of new rights–in essence, into a request for another equitable apportionment. If Nebraska is allowed to argue for modification of the decree, Wyoming and *amicus* Basin maintain, the same high evidentiary threshold applicable to claims for new apportionments applies. Under that standard, Nebraska can prevail only upon proof 'by clear and convincing evidence' of 'some real and substantial injury or damage.'
>
> . . .
>
> [W]e find merit in Wyoming's contention that, to the extent Nebraska seeks modification of the decree rather than enforcement, a higher standard of proof applies. The two types of proceeding are markedly different. In an enforcement action, the plaintiff need not show injury. See, *e.g., Wyoming v. Colorado,* 309 U.S. 572, 581 (1940). When the alleged conduct is admitted, the only question is whether that conduct violates a right established by the decree. To be sure, the right need not be stated explicitly in the decree. As the Master recognized, when the decree is silent or unclear, it is appropriate to consider the underlying opinion,

the Master's Report, and the record in the prior proceedings to determine whether the Court previously resolved the issue. See, *e.g., Wyoming v. Colorado,* 286 U.S. 494, 506-508 (1932). The parties' course of conduct under the decree also may be relevant. But the underlying issue primarily remains one of interpretation. In a modification proceeding, by contrast, there is by definition no pre-existing right to interpret or enforce. At least where the case concerns the impact of new development, the inquiry may well entail the same sort of balancing of equities that occurs in an initial proceeding to establish an equitable apportionment.

*Id*. at 590–92 (internal citations omitted) (emphasis in original).

The Supreme Court held that in interstate water disputes which invoke the Court's original jurisdiction, differing standards of proof should apply, depending upon whether the proceeding is to enforce a decree or to modify a decree, with the higher standard applying to the modification of a decree. *Id*. at 592. The Court's use of the word "enforcement" is not synonymous with "administration." Trying to equate enforcement, as it is used by the Supreme Court, with administration of water rights by the Idaho Department of Water Resources is comparing apples to oranges.

There was no federal water district encompassing the states involved in the litigation in which the federal government administers water rights. The Court simply determines the amount of water the upstream state may divert. It may be based upon a percentage of the river's flow, like in *Nebraska v. Wyoming,* 325 U.S. 589, 646 (1945) (*Nebraska I*) ("Accordingly, we conclude that the flat percentage method recommended by the Special Master is the most equitable method of apportionment."), or a specific quantity of water, *Wyoming v. Colorado*, 309 U.S. 572, 581 (1940) (*Wyoming II*) ("We conclude that the decree is not violated in any substantial sense so long as Colorado does not divert from the Laramie river and its tributaries more than 39,750 acre feet per annum."). When the Court adjudicated water rights between Wyoming and Colorado in the Laramie River, it realized that awarding Colorado a specific quantity of water would harm Wyoming in years of low water. The Court stated:

The water to satisfy the Colorado appropriations is, and in the nature of things must be, diverted in Colorado at the head of the stream, and because of this those appropriations will not be affected by any variation in the yearly flow, but will receive their full measure of water in all years. On the other hand, the Wyoming appropriations will receive the water only after it passes down into that state, and must bear whatever of risk is incident to the variation in the natural flow. Of course, this affords no reason for underestimating the available supply, but it does show that to overestimate it will work particular injury to Wyoming.

*Wyoming v. Colorado*, 259 U.S. 419, 485 (1922) (*Wyoming I*). That type of harm to the downstream state would occur because once the decree was issued, the water rights would not be administered based upon the doctrine of prior appropriation.

Enforcement as that term was used by the Supreme Court in *Nebraska II* simply meant interpreting the decree and, if one state was diverting more water than it was decreed, enjoining that violation. As the Court stated:

> In an enforcement action, the plaintiff need not show injury. When the alleged conduct is admitted, the only question is whether that conduct violates a right established by the decree. To be sure, the right need not be stated explicitly in the decree. As the Master recognized, when the decree is silent or unclear, it is appropriate to consider the underlying opinion, the Master's Report, and the record in the prior proceedings to determine whether the Court previously resolved the issue. The parties' course of conduct under the decree also may be relevant. *But the underlying issue primarily remains one of interpretation*.

507 U.S. at 592 (citations omitted) (emphasis added).

That is illustrated by the Court's decision in *Nebraska II*. The Court stated "that the Inland Lakes question is fairly characterized as an enforcement issue." *Id*. "The Inland Lakes are four off-channel reservoirs in Nebraska served by the Interstate Canal, which diverts from the North Platte at Whalen, Wyoming." *Id*. at 593. The Lakes and the Canal were part of an irrigation project operated by the United States Bureau of Reclamation (Bureau). *Id*. "Since 1913, the Bureau has diverted water through the Interstate Canal for storage in the Inland Lakes during nonirrigation months for release to Nebraska users during the irrigation season." *Id*. at 593–94. Wyoming contended that the decree did not grant storage rights in the Inland Lakes nor did it establish a priority date. The Court held that although the decree did not explicitly establish the storage rights, it was based upon their existence and Wyoming could not now challenge the 1904 priority date, which was based upon the priority date of the original components of the project. The Court wrote:

> The decree did not explicitly establish the Inland Lakes' priority. But it is undisputed that the Court recognized a right to store 46,000 acre-feet of water in the Inland Lakes and, at Wyoming's suggestion, counted that amount to reduce Nebraska's requirement of natural flows in the pivotal reach. The Master therefore concluded that the Inland Lakes' priority was a necessary predicate of the apportionment and should not be disturbed. He also suggested that Wyoming's postdecree acquiescence in the Bureau's administration of the Inland Lakes should prevent Wyoming from challenging the 1904 priority date now.

> We think the evidence from the prior litigation supports the conclusion that the Inland Lakes' priority was settled there. And even if the issue was not previously determined, we would agree with the Special Master that Wyoming's arguments are foreclosed by its postdecree acquiescence. Accordingly, we clarify today that the Inland Lakes share a December 6, 1904, priority date with other original components of the North Platte Project. Pursuant to that priority, the Bureau has a right to divert 46,000 acre-feet of water during the nonirrigation season months of October, November, and April for storage in the Inland Lakes.

*Id.* at 594–95 (citations omitted).

Thus, the enforcement issue addressed by the Court was simply an interpretation of the decree. It did not involve a determination of whether a diversion by a junior appropriator interfered with the water rights of a senior appropriator. There is no problem with applying a preponderance of the evidence standard to the interpretation of a decree. We apply the same rules of interpretation to a decree that we apply to contracts. *DeLancey v. DeLancey*, 110 Idaho 63, 65, 714 P.2d 32, 34 (1986).

Another difference between an enforcement proceeding before the United States Supreme Court and the administration of water rights under Idaho water law is that in the enforcement proceeding, injury to another appropriator is irrelevant. As the Court stated, "In an enforcement action, the plaintiff need not show injury." *Nebraska II*, 507 U.S. at 592.

In interstate water disputes filed in the United States Supreme Court under its original jurisdiction, injury is relevant in order to determine whether there is a justiciable controversy for entering a decree. The lack of injury, in the sense of failing to show that there is inequitable apportionment of the water between the states, will result in dismissal of the petition. *Kansas v. Colorado*, 206 U.S. 46, 117 (1907). Conversely, if the claims of two or more states to the water in a watercourse exceed the water available, then there is injury sufficient for judicial determination because the states will be unable to obtain the water they each claim. *Nebraska I*, 325 U.S. at 610–11.

After the Supreme Court determined in *Wyoming I* the quantity of water that Colorado could divert from the Laramie River, Colorado later sought to have Wyoming held in contempt for diverting more than the 39,750 acre feet it was decreed, and Colorado asserted as a defense that Wyoming had not been injured. The Court held that lack of injury to the downstream appropriator entitled to the water was not a defense. The Court stated:

> But such a defense is not admissible. After great consideration, this Court fixed the amount of water from the Laramie river and its tributaries to which Colorado

was entitled. Colorado is bound by the decree not to permit a greater withdrawal and, if she does so, she violates the decree and is not entitled to raise any question as to injury to Wyoming when the latter insists upon her adjudicated rights.

*Wyoming II*, 309 U.S. at 581. The only consideration regarding enforcement is whether the upstream state took more water than was permitted under the decree, and the only defense is whether the downstream state acquiesced in the upstream state doing so. *Id*. "That is the sole available defense." *Id.*

The reason injury is irrelevant with respect to the interstate decree in *Nebraska II* is that the federal government did not administer water rights in times of shortage based upon priority of appropriation. The Supreme Court adjudicated the initial decree in *Nebraska I*. The watercourse at issue was the North Platte River that originated in northern Colorado, flowed in a northerly direction into Wyoming, and then eventually turned east across the Great Plains into Nebraska. *Nebraska I*, 325 U.S. at 592–93. When it did so, it applied the standard of equitable apportionment. Because the states involved were priority states, the Court was guided by the rule of first in time, first in right, but it was not bound by that rule. *Id.* at 617–18. "[I]f an allocation between appropriation States is to be just and equitable, strict adherence to the priority rule may not be possible." *Id*. at 618. The factors that the Court considered in making an equitable apportionment included the following:

> Priority of appropriation is the guiding principle. But physical and climatic conditions, the consumptive use of water in the several sections of the river, the character and rate of return flows, the extent of established uses, the availability of storage water, the practical effect of wasteful uses on downstream areas, the damage to upstream areas as compared to the benefits to downstream areas if a limitation is imposed on the former-these are all relevant factors.

*Id*.

In its equitable apportionment between the states, the Court was not concerned with the harm that may be suffered by an individual appropriator. As the Court stated, "The equitable share of a State may be determined in this litigation with such limitations as the equity of the situation requires and irrespective of the indirect effect which that determination may have on individual rights within the State." *Id*. at 627. Once the Supreme Court enters a decree equitably apportioning the water between or among states, the priority dates of the individual appropriators in those states are irrelevant with respect to the enforcement of that decree. The apportionment of water among the appropriators in each state was left to that state. The Court rejected fixing the rights of each appropriator based upon strict priority for the reasons "(1) that it would deprive

33

each State of full freedom of intrastate administration of her share of the water and (2) that it would burden the decree with administrative detail beyond what is necessary to an equitable apportionment." *Id*. at 643.

An enforcement proceeding under federal interstate water law would be equivalent to the administration under Idaho water law only if there was enough water for all appropriators in Idaho to receive their decreed amounts. Then, administration would simply be interpreting the decrees to determine what amounts had been decreed for each appropriator and measuring their diversions to make sure that the appropriators only took their decreed amounts. However, that is not reality.

The difficult issue in administering water rights under Idaho law has always been changing conditions that result in there being insufficient water to provide the full amount that each appropriator is entitled under the appropriator's decree or license. Thus, an enforcement proceeding before the Supreme Court does not involve issues that are involved in administration such as whether the appropriator making the call is suffering material injury, the reasonableness of the appropriator's diversion, the appropriator's conveyance efficiency, whether the appropriator is putting the water to beneficial use, whether the appropriator is wasting water, and hydrology. *American Falls*, 143 Idaho at 876–77, 154 P.3d at 447–48.

In this respect, the administration of water rights under Idaho law is more akin to modification proceedings in the Supreme Court than to enforcement proceedings. In *Nebraska I*, the Court stated that "the decree which is entered must deal with conditions as they obtain today. If they substantially change, the decree can be adjusted to meet the new conditions." 325 U.S. at 620. As the Court reiterated in *Nebraska II*, the modification of a decree can require the Court to "answer unresolved questions and to accommodate 'change[s] in conditions'-a phrase sufficiently broad to encompass not only changes in water supply, but also new development that threatens a party's interests." 507 U.S. at 591. "At least where the case concerns the impact of new development, the inquiry may well entail the same sort of balancing of equities that occurs in an initial proceeding to establish an equitable apportionment." *Id*. at 592 (citations omitted).

Thus, the issues considered in modifying a decree based upon changes in conditions, such as decreasing or increasing water supply and the impact of new development, are more akin to the issues involved in administering federal water rights than the issues involved in federal enforcement. To the extent that *Nebraska II* sheds light on the appropriate standard of proof, it

34

would support the higher standard of clear and convincing evidence for administering water rights when a water source is over appropriated or during low-water years.

It is Idaho's longstanding rule that proof of "no injury" by a junior appropriator in a water delivery call must be by clear and convincing evidence. Once a decree is presented to an administrating agency or court, all changes to that decree, permanent or temporary, must be supported by clear and convincing evidence.

## V. CONCLUSION

We find that the Ground Water Act applies to the administration of A&B's water right 36-2080. We also find that the Director had substantial and competent evidence to support his decision not to set a reasonable groundwater pumping level and to analyze the water right on a system-wide as opposed to a well-by-well basis. In addition, we find that the district court did not err in imposing a clear and convincing evidence standard on the Director's determination of material injury in a delivery call. We therefore affirm the decision of the district court.

Justices EISMANN, J. JONES, HORTON and TROUT, Pro Tem, **CONCUR.**